**STATE of Missouri, Respondent,**

**v.**

**Larry Wayne BUTLER, Appellant.**

**No. 24324.**

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 16, 2002.

Motion for Rehearing or Transfer
Denied Oct. 1, 2002.

Application for Transfer Denied
Nov. 26, 2002.

Thomas D. Carver, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen. and Stephanie Morrell, Asst. Atty. Gen., Jefferson City, for respondent.

KERRY L. MONTGOMERY, Presiding Judge.

Following a bench trial, Larry Wayne Butler (Defendant) was convicted of using

a child in a sexual performance, § 568.080.[1] He was sentenced to three years' imprisonment. His sole point on appeal contests the sufficiency of the evidence. We affirm.

■ In a court-tried case, the sufficiency of the evidence is determined by the same standard as in a jury-tried case, and that is whether there is sufficient evidence from which the trier of fact could have reasonably found guilt. *State v. Downen*, 3 S.W.3d 434, 435 (Mo.App.1999). In determining whether there is sufficient evidence to support a finding of guilt, we may not weigh the evidence, but we accept as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and all contrary evidence and inferences are ignored. *Id.*

Viewed in the light most favorable to the verdict, the evidence shows that in October of 1998, E.E., a female, was in the third grade.[2] She would typically arrive home from school at around 3:30 in the afternoon and would be home alone until either her stepmother or babysitter arrived around 5 p.m.

On October 19, 1998, E.E. told her stepmother that she had been speaking with a man on the telephone. The man told E.E. to call him "Gary" but said that it was not his real name. He knew her full name and address. He said one of her parents asked him to call her because she was interested in sex. He refused to tell her which parent it was who had asked him to call.

During their conversation, he described how sexual intercourse occurred. He also explained a method used to prevent conception. He told her to put lotion on her finger and put her finger up her bottom. She pulled her pants down and did as he directed.

He also told her to touch her "front part," which she identified as her "pee-pee." He told her that he would come to her home if she wanted him to do so and that he would take her to a private place and show her how to have sex. He also said that he would like to have sex with her. He told her he would call again the next day.

After the phone call, she telephoned her grandmother and told her what had happened. She also told her stepmother and her father. E.E.'s parents notified police the next morning. Detective Mark Hall did a partial interview of E.E. and finished the interview the following week.

Her stepmother quit her second job in order to be home when E.E. came home from school. About seven days after the first call, the man, later identified as Defendant, called again. E.E. was instructed to pretend she was home alone and was doing what the caller asked. During this call and all subsequent calls, either E.E.'s stepmother or uncle were present.

E.E.'s parents attempted to record the conversation by using their answering machine, which recorded both sides of the conversation. This attempt failed. One of the detectives recommended buying a telephone recording system from Radio Shack. They did so and were able to record most of the subsequent conversations between E.E. and Defendant. With the help of the telephone company, they also began tracing incoming calls between 3 and 4 p.m. They also obtained Caller ID, a service from the telephone company that uses a device to record the telephone number of incoming calls.

From the Caller ID device, they were able to give detectives the phone numbers from where the calls were made. Using this information, detectives discovered that the calls were made from pay phones in

---

1. All statutory references are to RSMo 2000.

2. E.E. was born on June 29, 1989.

the east area of Springfield and the area around South Campbell Street in Springfield. E.E.'s parents borrowed a friend's cell phone in order to call the police when Defendant called and to give them the number displayed on the Caller ID device.

On November 25, 1998, Detective Tom Thorson (Detective) was part of a surveillance team on the east side of Springfield. Shortly before 4 p.m. he was directed by the communications center to head to 1675 East Seminole because E.E.'s parents had contacted the police regarding another obscene phone call. The address given to him by the communications center was approximately one-half mile from where he was stationed. It took him approximately one minute to arrive at that location.

Upon entering a shopping center parking lot, Detective moved to the location of the pay phones. Two pay phones were located in the southeastern part of the parking lot. Upon approaching this location, Detective observed a brown pickup truck leaving the area and a full-sized green car.

Detective decided to approach the green car as it was still parked at the pay phone. As he pulled up behind the green car, he observed Defendant in the driver's seat with the telephone receiver inside the car and held against the left side of his head. Detective exited his car and Defendant hung up the receiver. Defendant then picked the receiver up again, and Detective requested that he hang up the receiver.

Detective identified himself and explained that they were investigating an obscene phone call made from that phone. Defendant stated he was trying to call his wife but the line was busy. Detective called the police communications center and was given the phone number of where the call to E.E. came from on that particular day. The number given to him matched the number of the pay phone that Defendant was using. When Defendant exited his vehicle, Detective noticed that Defendant's pants were unzipped. Defendant was arrested. After Defendant's arrest, the obscene phone calls to E.E. stopped.

An expert in speech pathology and audiology, who specialized in voice disorders and the human voice, analyzed the tape recordings of the phone calls from Defendant to E.E. The expert compared the tapes to Defendant's voice. The comparison focused on analyzing the distinctive components of speech, such as loudness, pitch, articulation, resonance, rate, stress, and prosodic patterns. He concluded that the two voices were the same and thus spoken by the same person.

■ Defendant's sole point on appeal argues that there was insufficient evidence to sustain the conviction for use of a child in a sexual performance because there was no evidence showing the acts were performed visually before an audience. While Defendant raised other insufficiency of the evidence issues during oral argument, this Court only addresses the issue in the lone point relied on. Appellate review is limited to issues presented by an appellant's point relied on. *State v. Adams*, 808 S.W.2d 925, 930 (Mo.App.1991).

In support of his contention that the performance needed to be visual, Defendant relies on *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). In *Ferber*, the State of New York brought charges against a bookstore proprietor who sold undercover detectives explicit videotapes of young boys masturbating. *Id.* at 747, 102 S.Ct. 3348. The New York statute, under which the bookstore proprietor was convicted, prohibited "persons from knowingly promoting sexual performances by children under the age of 16 by distributing material which depicts such performances." *Id.* at 749, 102 S.Ct. 3348.

The State of New York statutorily defined performance as "any play, motion picture, photograph or dance" or "any other visual representation exhibited before an audience." *Id.* at 751, 102 S.Ct. 3348. The Supreme Court relied on this statute when it observed that "[h]ere the nature of the harm to be combated requires that the state offense be limited to works that *visually* depict sexual conduct by children . . . ." *Id.* at 764, 102 S.Ct. 3348.

Defendant's reliance on the *Ferber* decision is misplaced. Missouri, unlike New York, has not statutorily defined "performance" in conjunction with § 568.080, the statute Defendant was charged with violating. That section states:

**Child used in sexual performance, penalties.—**

1. A person commits the crime of use of a child in a sexual performance if, knowing the character and content thereof, the person employs, authorizes, or induces a child less than seventeen years of age to engage in a sexual performance or, being a parent, legal guardian, or custodian of such child, consents to the participation by such child in such sexual performance.

"Sexual performance" is defined as "any performance, or part thereof, which includes sexual conduct by a child who is less than seventeen years of age." § 556.061(31).[3] This statute does not limit the definition of a "sexual performance" to a visual performance.

"Performance" is not defined in chapter 568. In *State v. George,* 717 S.W.2d 857 (Mo.App.1986), this Court upheld a conviction under § 568.080 where the issue on appeal centered on a definition of "performance" as used in the statute. In that case, defendant forced his wife and son to have sexual intercourse while he watched. On appeal, defendant contended that no "performance" took place as a "performance contemplates a display for profit or something more of a formal or theatrical nature" or for non-family members. *Id.* at 859.

Relying on a dictionary definition, we determined that "performance" as used in the context of § 568.080 means "[a] presentation, especially a theatrical one, before an audience." *Id.* We held that "[a]lthough § 568.080 would prohibit a sexual performance for photographs or motion pictures, it is not limited to such performances." *Id.* We also said that § 568.080 seeks to "prohibit the exploitation of minors under seventeen in pornographic presentations for any reason." *Id.* In denying defendant's contention, we held:

Although defendant may have been as much director as he was audience, he was apparently carefully viewing the occurrences. Certainly, the circumstances here could have been as injurious to the minor as if viewed by non-family members. Preventing such damages is undoubtedly one of the purposes of § 568.080.

*Id.*

*George* holds that "performance," as used in § 568.080, means a presentation before an audience. *George* also holds that the statute does not limit a sexual performance to photographs or motion pictures. Nothing in George, § 568.080, or § 556.061(31) suggests that only a visual sexual performance is prohibited by the statute.

Defendant only claims the evidence was insufficient for lack of a visual performance. As demonstrated, § 568.080 is not

3. This statute is part of "The Criminal Code" of this state. § 556.011. The definition of "sexual performance" applies to this Code "unless the context requires a different definition." § 556.061. The context of § 568.080 does not require a different definition.

limited to a visual performance. Therefore, the State's evidence does not fail for the reasons advanced by Defendant.

Although E.E.'s presentation of sexual acts was not before a viewing audience, § 568.080 prohibits the exploitation of young children in pornographic presentations. *George*, 717 S.W.2d at 859. Certainly, under the circumstances here, Defendant exploited E.E. in a way little different from any exploitation suffered in a visual sexual presentation.

The judgment is affirmed.

GARRISON and BARNEY, JJ., concur.