

# In the Missouri Court of Appeals Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED102671 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable John J. Riley |
| JACOB RAGLAND, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 26, 2016 |

## Introduction

Appellant Jacob Ragland ("Ragland") appeals from the judgment of the trial court entered upon a jury verdict convicting Ragland of six counts of first-degree statutory sodomy, three counts of first-degree child molestation, and two counts of use of a child in a sexual performance for acts committed against J.J. and J.F., both minor children. Ragland was acquitted of five other counts pertaining to a third minor child, S.J. On appeal, Ragland contends that the trial court (1) erred in admitting evidence of J.F.'s out-of-court statements under Section 491.075; (2) erred in admitting evidence of J.J.'s out-of-court statements under Section 491.075; (3) abused its discretion in sending State's Exhibits 7, 9, and 11—videos of J.F., J.J., and S.J.'s Children's Advocacy Center ("CAC") interviews—to the jury during deliberations without supervision or limiting instructions; (4) clearly erred in overruling Ragland's motion for judgment of acquittal with respect to the two counts of use of a child in a sexual performance

because the State failed to provide sufficient evidence that Ragland "watched" the performance; and (5) abused its discretion in refusing to allow the jury to take notes during the trial.

Because the time, content, and circumstances of J.F.'s and J.J.'s out-of-court statements provided sufficient indicia of reliability, the trial court did not abuse its discretion in admitting these statements at trial under Section 491.075. Because the CAC interview videos to which Ragland objects were not testimonial in nature, the trial court did not plainly err in allowing the jury access to the videos during deliberation. Because the State presented sufficient evidence supporting Ragland's conviction on two counts of use of a child in a sexual performance, the trial court did not clearly err in overruling Ragland's motion for judgment of acquittal at the close of all of the evidence. Finally, trial court did not abuse its discretion by prohibiting note-taking by jurors when the request was made after the first prosecution witness had already testified. Accordingly, we affirm the judgment of the trial court.

## Factual and Procedural History

Ragland was charged with six counts of first-degree statutory sodomy, three counts of first-degree child molestation, and two counts of use of a child in a sexual performance for acts committed against J.J. and J.F. Ragland was charged with five other counts pertaining to S.J.

On March 23, 2014, the State filed its Notice of Intention to Use Statements pursuant to Section 491.075.3—specifically, out-of-court statements made by J.F. and J.J.[1] The State sought to use statements made by J.F. to his aunt, Carmen Jackson ("Carmen"), his mother, Jasmine Kidd ("Jasmine"),[2] and Connilee Christie ("Christie") of the CAC. The State also gave notice of

---

[1] The State also sought to use out-of-court statements by S.J. Ragland does not challenge the admissibility of S.J.'s statements under Section 491.075 on appeal.

[2] Carmen Jackson, Jasmine Kidd, and Marcus Dukes are referred to throughout the transcript and record on appeal by their first names. We similarly refer to them by their first names in this opinion for the sake of clarity and intend no disrespect in doing so.

2

its intent to use statements made by J.J. to his mother, Carmen, and to Pamela Musgrave ("Musgrave") of the CAC. The trial court held a Section 491 hearing ("491 Hearing") on September 22 and 23, 2014.

## I.   491 Hearing

### A.   Jasmine's Testimony

Jasmine's testimony at the 491 Hearing consisted of the following facts. Jasmine testified that Carmen told her J.F. had said something while playing video games that led Carmen to believe Ragland may have touched J.F. inappropriately. At that point, Jasmine and Carmen began questioning J.F. about what happened; Ragland and Jasmine's boyfriend, Marcus Dukes ("Marcus"), were present in the room. Jasmine asked J.F., "did it happen?" and he said "no." Marcus then took J.F. on a walk by himself. When Marcus and J.F. returned, Marcus told Jasmine that she should keep talking to J.F. to uncover the truth, because J.F. made a comment to Marcus that "the first time it happened was at Little Dan's house."[3]

Jasmine continued to question J.F., again with all four adults present. Jasmine specifically asked J.F. if Ragland had touched him, not if anyone generally had touched him. Jasmine stated that she and the other adults questioned J.F. for thirty minutes. Jasmine asked J.F. if he told Carmen "that [Ragland] had been messing with [him]," and he said "yes." J.F. had a look on his face like he might be lying or scared, so Jasmine had him take off his clothes. Jasmine stated that J.F. answered "yes" prior to taking his clothes off, and that the purpose of having J.F. take off his clothes was to "get the truth out of him," to "get to the bottom" of things, because J.F. is "scared of whoopings." After telling J.F. to take off his clothes, Jasmine told him "that if he was lying he was going to be in trouble," and that "[i]f he was not lying that he just

---

[3] "Little Dan" was Ragland and Marcus's friend.

3

needed to keep letting us know, keep telling us the whole story and let us know what happened." Jasmine denied that she threatened to beat J.F. at any point, but stated that she was holding a belt.

Jasmine testified that she said the following to J.F.: "If you're lying then you're going to get in trouble, but if you're not lying you're not going to get in trouble, and I'm not going to whoop you, but I need to know the truth, because I don't ... want to say that this man did something to ... you and he gets in trouble if he didn't do nothing to you." J.F. then began crying and starting to "tell the story," stating that "[Ragland] made [J.J.] suck on him while they was in the house" on Saloma while Jasmine and Marcus were gone. J.F. pointed to his penis to indicate where Ragland made J.J. suck on him.

Finally, Jasmine testified that she had a private conversation with J.F. later that same night. J.F. told Jasmine and Marcus that Ragland made J.J. "do the sucking on his private area thing" twice at the house on Saloma. J.F. also told Jasmine and Marcus that Ragland made J.F. and J.J. play a game in the basement of Little Dan's house while everyone else was sleeping, in which Ragland made J.J. touch J.F.'s penis.

B.     Carmen's Testimony

Carmen's testimony at the 491 Hearing consisted of the following facts. She and J.F. were playing video games when J.F. made a comment about "sucking" at the game, followed by "something in reference to [Ragland] and him sucking."[4] Carmen then asked J.F. if Ragland had touched him; J.F. initially said "no" and then "a few seconds later" put his head down and said

---

[4] Carmen's testimony about J.F.'s exact statement regarding the "sucking" varied throughout the 491 Hearing. In addition to her above testimony, she also made the following statements: (1) "[J.F.] said something about he sucked at that game, and he brought Jacob's name up, and he said something about Jacob sucking and I said, "what do you mean?" and (2) "[J.F.] said he sucked at that, and then he said something about, 'Like Jacob,' and I said, 'what do you mean like Jacob' ... I asked him if Jacob had touched him, because the way he said sucking, and he put his head down whenever he said that like he was ashamed."

4

"yes." Carmen responded by asking where Ragland had touched J.F., who responded that Ragland had touched him "where he's not supposed to."

Carmen confirmed that Jasmine questioned J.F. while both she and Ragland were present. Carmen also testified that, after forty-five minutes to one hour of denying that Ragland touched him, J.F. told Jasmine that Ragland had touched him. Carmen stated that Jasmine did not make J.F. take off his clothes, but that Jasmine did "get out a belt." When Jasmine got the belt out, J.F. "kept saying 'Yes, it happened and then no, it didn't happen.'" Carmen testified that Jasmine told J.F. that if he said Ragland did not touch him, and she found out he was lying, "she was going to beat him until he bled."

Carmen also spoke with her own children, including J.J., after J.F.'s disclosure. Carmen's children told her Ragland had never touched them. However, Carmen later had an individual conversation with J.J. after Ragland was in jail; Carmen asked J.J. if Ragland had ever touched him in a place where he is not supposed to be touched. J.J. responded that Ragland did, stating that Ragland "was sucking on him in his genital areas and had [J.J.] sucking on [Ragland]."

Finally, Carmen testified that at some point, she learned that S.J. had offered to pay J.J. money to tell the CAC interviewer that Ragland had touched him, although S.J. never actually paid J.J. J.J. later claimed to have told the CAC interviewer that Ragland touched him "because [S.J.] said she was going to pay me to say that."

C.    CAC Interview Evidence

Musgrave testified that she conducted a CAC interview of J.J., who was nine years old at the time. Musgrave stated that J.J. understood her questions and was able to provide answers. The interview was videotaped and admitted into evidence at the 491 Hearing.

5

Christie testified that she conducted a CAC interview of J.F., who was seven years old at the time. Christie stated that J.F. was able to provide answers to her questions but sometimes seemed confused, so she rephrased some questions. Christie had to rephrase her questions more frequently than normal for a seven-year-old, but stated that she was able to do so in a way that was not leading. Christie also testified that when J.F. mentioned his "wee-wee," she asked him if anyone had ever touched his wee-wee; he responded that Ragland had. Christie stated that in her professional opinion, she would not consider her question to be a leading question. The interview was videotaped and admitted into evidence at the 491 Hearing.

D.    Trial Court's Ruling

The trial court found that J.F.'s statements to Carmen and Jasmine were sufficiently reliable given the totality of the circumstances, and thus, admissible. The trial court found that J.F.'s statements demonstrated knowledge of subject matter unexpected of a child his age. The trial court also reasoned that Jasmine's behavior, "in a strange kind of way," did *not* provide J.F. with a motive to fabricate his statements; instead, Jasmine was insisting that J.F. tell the *truth*. In support of this conclusion, the trial court found it important that Jasmine did not tell J.F. what to say or pressure him to give her a specific answer, but rather, simply sought whatever the truth was:

> But she's not saying—you're saying no, no, no ... she doesn't say if you don't tell me yes I'm going to give you a whooping. She says, "If you tell me—if what you tell me is a lie and I later find out it's a lie then I'm going to give you a whooping," which I think is her way of saying you should tell the truth.

Finally, the trial court reasoned that Ragland's presence in the room increased the reliability of J.F.s statements that Ragland had abused him.

The trial court found that J.J.'s statements to Carmen were admissible, reasoning that the totality of the circumstances demonstrated sufficient reliability. The trial court noted that many

6

of the issues raised by counsel for Ragland at the 491 Hearing could properly be brought up on cross-examination at trial.

The trial court watched the taped CAC interviews and, based on the content of the interviews and the testimony of Musgrave and Christie, found that the "time, content and circumstances" of J.J. and J.F.'s statements in the CAC interviews provided "sufficient indicia of reliability" to be admissible under Section 491.075.

## II.  Trial

The case proceeded to a jury trial in January, 2015.  J.J., J.F., S.J., Musgrave, Christie, Jasmine, Carmen, Marcus, and Ragland all testified at trial.  The CAC interview videos for J.J., J.F., and S.J. were each admitted into evidence and played for the jury.  The testimony given by Jasmine, Carmen, Musgrave, and Christie largely mirrored their testimony at the 491 Hearing. The following evidence was also adduced at trial based on J.J. and J.F.'s testimony and the CAC interview videos:

J.F. stated that Ragland sucked J.F.'s penis with his mouth, put his penis in J.F.'s mouth, and "humped" or rubbed J.F.'s anus with his penis.  J.F. used anatomical dolls in his CAC interview to demonstrate this "humping" and "sucking."  J.F. also stated that Ragland made J.J. and J.F. suck each other's penises.  J.F. said that Ragland showed J.J. "how to do it" and told J.J. to "hump" J.F. and to "suck it;" that Ragland made J.F. suck J.J.; and that Ragland made J.J. suck J.F. J.F. also stated that something came out of Ragland's "wee-wee" and that it was "white stuff."

J.J. stated that Ragland made J.J. put his hand on Ragland's penis, rubbed his penis between J.J.'s legs, "humped" J.J., placed his hand on J.J.'s penis, and placed his mouth on J.J.'s penis, and made J.J. suck his "privacy."  J.J. said that something "white," "gooey," and "slimy"

7

came out of Ragland's "hot dog." J.J. also stated that Ragland told him he would kill his mother and sisters if he told anyone.

After the testimony of the first prosecution witness had concluded, defense counsel requested that the jury be allowed to take notes during trial. The State objected to defense counsel's request because the trial had already begun and extensive testimony had already been heard by the jury without the benefit of taking notes. The trial court denied defense counsel's request, noting its concern "that the first Witness's testimony might not be given equal weight with the testimony [the jury] would hear if they had the notepads."

Ragland made a motion for judgment of acquittal at close of all the evidence. The trial court denied the motion and the case was submitted to the jury for deliberations.

During its deliberations, the jury requested various items of evidence, including State's Exhibits 7, 9, and 11, the videotaped CAC interviews of J.F., J.J., and S.J. Defense counsel objected to the videos being given to the jury and stated the following rationale:

> Yes, Judge, especially in a case like this where it was five days long, 16 Counts, the Jurors couldn't take notes. I'm worried that, if their memory fails them as to what was said in court, that, watching the Video again: That the Video would have unfairly strong influence on their verdict in that scenario, and I object based on my client's rights to due process and a fair Trial; U.S. Constitutional Amendments 5, 6, 8 and 14; Missouri Constitution, Article 1, Sections 10, 18A, 19 and 21.

The trial court overruled the objection and allowed the jury access to the videotapes, along with a computer and speakers with which to view the videos.

The jury returned a verdict finding Ragland guilty of six counts of first-degree statutory sodomy, three counts of first-degree child molestation, and two counts of use of a child in a sexual performance. The trial court sentenced Ragland, and this appeal follows.

8

## Points on Appeal

Ragland raises five points on appeal. First, Ragland contends the trial court erred in admitting evidence of J.F.'s out-of-court statements under Section 491.075. Specifically, Ragland argues that J.F.'s statements lacked reliability because the statements were prompted by suggestive questioning, making J.F. strip naked, and threatening him with a belt. Second, Ragland avers the trial court erred in admitting evidence of J.J.'s out-of-court statements under Section 491.075. Specifically, Ragland claims J.J.'s statements lacked reliability because the record indicates that J.J. initially denied any inappropriate conduct but was later prompted by suggestive questioning by Carmen. Third, Ragland contends the trial court abused its discretion in sending State's Exhibits 7, 9, and 11, the videos of J.F., J.J., and S.J.'s CAC interviews, to the jury during deliberations without supervision or limiting instructions. Specifically, Ragland argues that the videos constituted testimonial evidence, and that by giving the jury license to listen to the testimony without restriction, the trial court created a presumption that such evidence was to be given more weight than other evidence at trial. Fourth, Ragland claims the trial court clearly erred in overruling his motion for judgment of acquittal at the close of all of the evidence and in sentencing him on two counts of use of a child in a sexual performance because the State failed to prove Ragland watched the performance, which is an essential element of the crime. Finally, Ragland avers the trial court abused its discretion when it refused to allow the jury to take notes during the trial.

## Discussion

### I.   Points One and Two—Reliability of Hearsay Statements

Ragland argues that the trial court abused its discretion in admitting evidence of both J.F. and J.J.'s out-of-court statements pursuant to Section 491.075. Ragland contends that J.F. and

9

J.J.'s out-of-court statements lacked sufficient indicia of reliability to be admitted under Section 491.075. We disagree.

A.     Standard of Review

We review a trial court's decision to admit hearsay testimony under Section 491.075 for abuse of discretion. State v. Thompson, 341 S.W.3d 723, 729 (Mo. App. E.D. 2011) (citing State v. Redman, 916 S.W.2d 787, 792 (Mo. banc 1996)). This Court will find "that a trial court abused its discretion in admitting a child's out-of-court statements pursuant to Section 491.075 only where the trial court's findings are not supported by substantial evidence in the record." Thompson, 341 S.W.3d at 729. "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Id. Further, "error in admitting evidence is not prejudicial requiring reversal unless it is outcome-determinative." Id. at 730.

B.     Applicable Law

Section 491.075 provides, in relevant part:

1. A statement made by a child under the age of fourteen, or a vulnerable person, relating to an offense under chapter 565, 566, 568 or 573, performed by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2)(a) The child or vulnerable person testifies at the proceedings ...

Ragland does not dispute the existence of most of the requirements for admission of J.F. and J.J.'s statements under Section 491.075. Both J.F. and J.J. were under the age of fourteen. The statements related to offenses under the required statutory sections allegedly committed by Ragland. Further, both J.F. and J.J. testified at trial. The only issue on appeal is whether the

10

time, content, and circumstances of J.F. and J.J.'s hearsay statements provided sufficient indicia of reliability for the trial court to admit the statements at trial. See Section 491.075.1(1).

To determine the reliability of a child's out-of-court statements for purposes of Section 491.075, we look to the totality of the circumstances. Thompson, 341 S.W.3d at 729. Several non-exclusive factors aid us in our analysis: (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) the lack of a motive to fabricate; (4) knowledge of subject matter unexpected of a child of similar age; (5) the lapse of time between when the acts occurred and when the victim reported them; and (6) the technique employed by the interviewer. Id. In considering these factors, we assess only the evidence presented at the 491 Hearing. State v. Sprinkle, 122 S.W.3d 652, 661 (Mo. App. W.D. 2003). "The unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." State v. Lane, 415 S.W.3d 740, 749 (Mo. App. S.D. 2013).

Out-of-court statements admitted under the provisions of Section 491.075 are considered substantive evidence of the truth of the matter asserted. Id. at 751. "Such statements, and any inferences that may be drawn from those statements, may alone constitute substantial evidence of an element of the offense charged." Id. Importantly, once such statements are properly admitted according to the procedure in Section 491.075, "admissibility is not the issue, but rather whether the trier of fact believes the evidence." Id. Inconsistencies and conflicts in testimony go to the credibility of the witness, not the admissibility of the testimony, and are left to the jury to resolve. Id.

C.     Point One—Reliability of J.F.'s Out-of-Court Statements

Ragland argues that J.F.'s statements lacked reliability because his disclosures were prompted by suggestive questioning by multiple persons, J.F. was forced to strip naked while being questioned, and J.F. was threatened with a belt while being questioned. Ragland also

11

posits that J.F.'s statements lacked spontaneity and consistency, and were made with a motive to fabricate. We are not persuaded.

### 1. Spontaneity and Consistency

The record shows that J.F. made an initial, completely spontaneous disclosure to Carmen while playing video games which implied that he and Ragland had been engaged in improper behavior, such that Carmen felt compelled to inquire further. While Carmen's testimony about the exact wording of J.F.'s initial disclosure varied slightly, any inconsistencies in her testimony reflect upon her credibility as a witness, not the admissibility of the testimony. Such inconsistencies are properly left to the jury to resolve. Lane, 415 S.W.3d at 751. Further, even though Carmen followed J.F.'s initial disclosure with specific inquiries about abuse by Ragland, J.F. almost immediately confirmed that Ragland had touched him, which was consistent with J.F.'s initial spontaneous disclosure. The central question with respect to spontaneity is "whether the victim was prompted or pressured to make the disclosures or whether the victim freely volunteered them." Sprinkle, 122 S.W.3d at 662. Here, while J.F.'s follow-up statement to Carmen confirming the abuse by Ragland was prompted by her questioning, his initial disclosure was freely volunteered. This factor weighs in favor of reliability.

We acknowledge that J.F's subsequent statements to Jasmine were considerably less spontaneous due to Jasmine's repeated questioning. Moreover, we are disturbed by Jasmine's unorthodox tactics when questioning J.F. Our concerns are lessened by the fact that at the time Jasmine questioned J.F., he already had made an initial spontaneous disclosure to Carmen and already had told Carmen that Ragland was the person who abused him. While Jasmine's conduct certainly influenced J.F. to make his disclosure to her, we are not persuaded that her pointed questions about Ragland substantially detract from the reliability of the statements made by J.F.

12

J.F.'s statements in his CAC interview with Christie further demonstrate spontaneity weighing in favor of reliability. "Whenever there are allegations of sexual abuse the children must be interviewed and statements to a professional interviewer are not unreliable simply because the purpose of the interview is to discuss the abuse." Id. Here, while Christie prompted J.F. with questions and rephrased certain questions to combat J.F's confusion, J.F. freely indicated that Ragland had touched him and provided various details about Ragland's abuse, sometimes using anatomical dolls to demonstrate "humping" and "sucking." Further, Christie testified that in her professional opinion, her rephrased questions to J.F. were not leading questions.

Finally, J.F.'s statements were highly consistent, weighing in favor of reliability. The fact that J.F. added details as he recounted the incident does not render his statements inconsistent. See id. at 663. Not only is it common for "children's accounts of the abuse to contain some variations, contradictions or lapses in memory," but Missouri courts have noted that "there is a fundamental difference between inconsistency and describing different details at different times." N.J.K. v. Juvenile Officer, 139 S.W.3d 250, 257 (Mo. App. W.D. 2004); Sprinkle, 122 S.W.3d at 663. Here, J.F. began with an initial disclosure to Carmen about Ragland and "sucking," followed by a general statement about "touching." J.F.'s subsequent disclosure to Jasmine was consistent with his initial statements to Carmen. J.F. then provided further, more specific details during his CAC interview which were consistent with his earlier, general disclosures.

### 2.     Motive to Fabricate

The trial court found that the circumstances surrounding the statements J.F. made to Jasmine did *not* give J.F. a motive to fabricate. We first note that the testimony regarding the

13

exact circumstances of Jasmine's questioning of J.F. was in considerable conflict. Jasmine testified that she made J.F. strip naked. Carmen testified that J.F. was not naked at the time of the questioning. Jasmine denied that she threatened to beat J.F., but Carmen testified that Jasmine threatened to beat J.F. "until he bled" if he did not tell the truth. Finally, Jasmine claimed the questioning lasted no longer than thirty minutes, while Carmen recalled that the questioning lasted one hour. As explained above, such inconsistencies go to witness credibility and are properly left for the jury to resolve. Lane, 415 S.W.3d at 751.

We acknowledge Ragland's challenge regarding the aggressive methods used by Jasmine in her interaction with J.F., regardless of whose version of the events the jury believed. However, despite our concerns as to Jasmine's methods, we are unable to conclude that the trial court abused its discretion in finding that Jasmine's behavior, while far from ideal, did not motivate J.F. to fabricate his statements. As noted by the trial court, the record reflects that Jasmine insisted to J.F. that he tell the truth—and not that he give her a specific answer. While the trial court reasonably could have reached the opposite conclusion, "[i]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Thompson, 341 S.W.3d at 729.

### 3. Knowledge of Subject Matter Unexpected of a Child of Similar Age

Finally, the record shows that J.F.'s knowledge of sexual acts was far beyond what would be expected of a 7-year-old, weighing in favor of reliability. In assessing content-reliability, courts should not place undue emphasis on the particular vocabulary used by a child, but must determine whether knowledge of the *subject matter* described by the child is unexpected of a child of similar age. Lane, 415 S.W.3d 749 (emphasis added).

14

Here, while J.F. used certain age-appropriate vocabulary such as "wee-wee" and "white stuff," he demonstrated a knowledge of sexual acts and subject matter beyond what normally would be expected of a 7-year-old child. J.F. spoke about "sucking" penises, "humping," and Ragland rubbing J.F.'s anus with his penis. J.F. also graphically described Ragland ejaculating. J.F.'s knowledge of such sexual acts weighs heavily in favor of the reliability of his statements.

Considering the totality of the circumstances, the time, content, and circumstances of J.F.'s statements provided sufficient indicia of reliability for the trial court to admit the statements at trial under Section 491.075. While certain issues were raised at the 491 Hearing which impacted witness credibility, the trial court reasonably found that such issues went to the weight, rather than the admissibility, of the testimony. The trial court did not abuse its discretion is admitting J.F.'s out-of-court statements to Carmen, Jasmine, and Christie. Point One is denied.

D.    Point Two—Reliability of J.J.'s Out-of-Court Statements

Ragland claims J.J.'s statements lacked reliability because (1) J.J. initially denied any inappropriate conduct but was later prompted by suggestive questioning by Carmen; and (2) the statements lacked spontaneity, consistency, and were made with a motive to fabricate. We disagree.

While J.J. initially denied that Ragland abused him when questioned by Carmen, he later revealed in his CAC interview that Ragland had threatened to kill J.J.'s mother and sisters if he told anyone. Once Ragland was in jail, Carmen asked J.J. if Ragland had ever touched him in a place where he is not supposed to be touched. At that point, J.J. disclosed the abuse, stating that Ragland had "sucked" on him. J.J.'s statement to Carmen was prompted by her pointed questioning. Accordingly, J.J.'s, statement was not spontaneous.

15

J.J.'s statements were, however, consistent. The fact that J.J. initially denied the abuse, ostensibly due to Ragland's threat, does not render his statements inconsistent. On the contrary, J.J.'s first disclosure to Carmen specified that he and Ragland had engaged in "sucking," a claim he repeated to Musgrave during his CAC interview. J.J. disclosed further details that were not inconsistent with his initial disclosure during the CAC interview, including claims that Ragland made J.J. put his hand on Ragland's penis, rubbed his penis between J.J.'s legs, "humped" J.J., and placed his hand on J.J.'s penis. The fact that J.J. added details the second time he told his story does not make his statements inconsistent. See Sprinkle, 122 S.W.3d at 663. The consistency of J.J.'s statements weighs in favor of reliability.

Also weighing in favor of reliability is J.J.'s lack of motive to fabricate his statements. Ragland's threat to kill J.J.'s mother and sisters provided J.J. with no incentive or reason to fabricate statements that Ragland had abused him.[5]

Finally, the terminology used by J.J. weighs in favor of reliability, as his statements demonstrated a knowledge of sexual subject matter beyond what would be expected of a 9-year-old child. "In assessing content-reliability, courts should not place undue emphasis on the particular vocabulary used by a child but must determine whether knowledge of the *subject matter* described by the child is unexpected of a child of similar age." Lane, 415 S.W.3d at 749 (emphasis added). J.J. used certain age-appropriate vocabulary such as "privacy" and "hot dog," but the sexual acts he described demonstrated a knowledge of sexual subject matter unexpected of a child of a similar age. J.J. described oral sex with Ragland, as well as Ragland humping and rubbing his penis on J.J. J.J. also graphically described Ragland ejaculating.

---

[5] Ragland urges that the testimony about S.J. potentially offering J.J. money to say that Ragland abused him gave J.J. a motive to fabricate his statements. We note that such evidence was somewhat conflicting. Evidence regarding such potential payments goes to witness credibility, to be probed on cross-examination, and was properly left to the jury to resolve.

Considering the totality of the circumstances, the time, content, and circumstances of J.J.'s statements provided sufficient indicia of reliability for the trial court to admit the statements at trial under Section 491.075. The trial court did not abuse its discretion is admitting J.J.'s out-of-court statements to Carmen and Musgrave. Point Two is denied.

## II.  Point Three—Jury's Access to Videos

Ragland contends the trial court abused its discretion in allowing the jury to view State's Exhibits 7, 9, and 11—videos of J.F., J.J., and S.J.'s CAC interviews—during deliberations "without supervision or limiting instructions," because "giving the jury license to listen to that testimony as often as desired created a presumption that this evidence was to be given more weight than other evidence admitted at trial."

### A.  Preservation of Error and Standard of Review

We must first determine whether Ragland properly preserved this issue for appeal. An appellant's argument on appeal is limited to the arguments made at trial. State v. Johnson, 207 S.W.3d 24, 43 (Mo. banc 2006). "An appellant cannot broaden the scope of his objections on appeal beyond that made in the trial court." Id. "A point is preserved for appellate review only if it is based on the same theory presented at trial." Id. The rationale behind this rule is that, "[i]n the absence of a timely and proper objection, the trial court has no opportunity to take corrective action." State v. Tindle, 395 S.W.3d 56, 61 (Mo. App. S.D. 2013).

At trial, defense counsel objected solely to the videos being given to the jury during deliberations. Defense counsel offered the following rationale:

> Yes, Judge, especially in a case like this where it was five days long, 16 Counts, the Jurors couldn't take notes. I'm worried that, if their memory fails them as to what was said in court, that, watching the Video again: That the Video would have unfairly strong influence on their verdict in that scenario, and I object based on my client's rights to due process and a fair Trial; U.S. Constitutional Amendments 5, 6, 8 and 14; Missouri Constitution, Article 1, Sections 10, 18A, 19 and 21.

17

On appeal, Ragland's argument has changed. Ragland does not argue that the trial court erred in allowing the videos to be provided to the jury during deliberation. Instead, Ragland maintains that the trial court abused its discretion by allowing the jury to view the videos "without supervision or limiting instructions," because "giving the jury license to listen to that testimony as often as desired created a presumption that this evidence was to be given more weight than other evidence admitted at trial."

Thus, the theory behind Ragland's objection at trial—that the jury should not have been allowed to view the videos *at all*—materially differs from the theory behind Ragland's claim on appeal—that the jury should not have been allowed to view the videos "*without supervision or limiting instructions.*" The issue raised by Ragland on appeal relates to the frequency and circumstances under which the jury could view the videos. Because a point is preserved for appellate review only if it is based on the same theory presented at trial, Ragland's third point on appeal is not properly preserved for our review.

Accordingly, we may review Ragland's claim only for plain error pursuant to Rule 30.20. Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted." Plain-error review involves a two-prong determination. State v. Partain, 310 S.W.3d 765, 767 (Mo. App. E.D. 2010). First, we determine whether the trial court committed plain error. Id. Plain error is error that is "evident, obvious, and clear." Id. If we find plain error, we then consider the second prong: "whether a manifest injustice or miscarriage of justice has actually occurred as a result of the error." Id.

B.    Analysis

"It is within the trial court's sound discretion whether a properly admitted exhibit will be shown to the jury during deliberations." Id. at 768. "This discretion is abused only when

18

allowing an exhibit to go to the jury was untenable and clearly against reason, and works an injustice." State v. Parker, 208 S.W.3d 331, 338 (Mo. App. S.D. 2006). An objecting party has the burden of showing the prejudicial result of sending exhibits to the jury. Id.

Ragland contends the videos were testimonial in nature and thus barred from being given to the jury, citing the general rule "that exhibits that are testimonial in nature cannot be given to the jury during its deliberation." Id. We disagree.

The precise issue before us was decided adversely to Ragland's position in Parker and Partain. In both Parker and Partain, the Court held that videos of CAC interviews with child sex victims, like the videos in question here, were not testimonial evidence and could not be prohibited from being viewed by the jury during its deliberations. In both cases, the Court found it important that the victims interviewed in the CAC videos also testified at trial, making the videos distinct from and not duplicative of the victims' testimony. Thus, Parker and Partain clearly stand for the proposition that while exhibits that are testimonial in nature are barred from being given to the jury during its deliberation, videos of CAC interviews with child sex victims "do not fall within this bar." Partain, 310 S.W.3d at 768; Parker, 208 S.W.3d at 339.[6]

Following the guidance of Partain and Parker, because J.F., J.J., and S.J. testified at trial, the CAC interview videos were not testimonial in nature. Accordingly, the trial court committed no error, plain or otherwise, in allowing the jury access to the videos during deliberations. If facially substantial grounds for plain error are not found to exist, the Court should decline to

---

[6] While the Court in both Partain and Parker additionally observed that the trial court in each case took steps to limit the jury's access to the CAC videos, this factual distinction has no bearing on our holding. Under Partain and Parker, videos of CAC interviews with child sex victims do not fall within the general bar on testimonial exhibits. Because J.F., J.J., and S.F. testified at trial, and because the CAC videos were distinct and not duplicative of the live testimony, the danger that the videos would improperly bolster the victims' testimony, allowing them to "testify twice," was mitigated. See Parker, 208 S.W.3d at 339.

19

exercise its discretion to review for plain error pursuant to Rule 30.20. State v. Walker, 330 S.W.3d 122, 127 (Mo. App. E.D. 2010). Accordingly, Point Three is denied.

## III.    Point Four—Sufficiency of the Evidence as to Counts VI and XI

Ragland contends that the trial court clearly erred in overruling his motion for judgment of acquittal at the close of all of the evidence and in sentencing him on two counts of use of a child in a sexual performance (Counts VI and XI). Specifically, Ragland claims the State failed to prove that Ragland watched the performance, which Ragland argues is an essential element of the crime of use of a child in a sexual performance.

### A.    Standard of Review

A challenge to the sufficiency of the evidence supporting a criminal conviction challenges the trial court's ruling on the motion for judgment of acquittal prior to submission of the case to the jury. Lane, 415 S.W.3d at 752. As a result, "[t]he question of sufficiency arises before the case is put to the jury and is really an issue of whether the case should have been submitted to the jury." State v. Beggs, 186 S.W.3d 306, 312 (Mo. App. W.D. 2005). Where, as here, a defendant challenges the denial of a motion for judgment of acquittal at the close of all evidence occurring before the trial court instructed the jury, we evaluate whether the State presented sufficient evidence to submit to the jury the cases against the defendant for the charged crimes *without regard* to the form of the verdict-director. State v. Myles, 479 S.W.3d 649, 660 (Mo. App. E.D. 2015).

Thus, the focus of our review when addressing a claim challenging the sufficiency of the evidence is to look at the elements of the crime and consider each in turn. Id. Our review is limited to a determination of whether, viewing the evidence in the light most favorable to the State, there is sufficient evidence from which a reasonable juror could have found the essential

20

elements of the charged crime beyond a reasonable doubt.[7] Id. The elements of an offense are derived from the statute establishing the offense or, when relevant, common law definitions. Id. There must be sufficient evidence of each element of the offense. Id. The State has the burden of proving every element of a criminal case. State v. Taylor, 126 S.W.3d 2, 4 (Mo. App. E.D. 2003).

> B.     There was sufficient evidence supporting Ragland's convictions for use of a child in a sexual performance.

The crime of use of a child in a sexual performance is codified in Section 568.080.1:

> A person commits the crime of use of a child in a sexual performance if, knowing the character and content thereof, the person employs, authorizes, or induces a child less than seventeen years of age to engage in a sexual performance or, being a parent, legal guardian, or custodian of such child, consents to the participation by such child in such sexual performance.

"Sexual performance" is defined as "any performance, or part thereof, which includes sexual conduct by a child who is less than seventeen years of age." Section 556.061(31). Here, Ragland does not deny that the evidence presented at trial showed that he directed J.F. and J.J., both children under the age of seventeen, to engage in sexual conduct with one another. J.F. told the CAC interviewer that Ragland showed J.J. how to perform oral sex and ordered J.J. and J.F. to "suck each other's penises." Instead, Ragland contends that the evidence was insufficient to convict him of the charged crime of use of a child in a sexual performance because there was no evidence that he *watched* J.F. and J.J. engage in the sexual conduct.

Ragland's argument has been squarely rejected by both our Southern District in State v. Butler, 88 S.W.3d 126 (Mo. App. S.D. 2002), and the Missouri Supreme Court in State v. Blankenship, 415 S.W.3d 116 (Mo. banc 2013). In Butler, the Court held that Section 568.080

---

[7] Accordingly, the content of the jury instructions relating to Counts VI and XI—Instructions 10 and 15—is irrelevant to our sufficiency-of-the-evidence analysis.

"does not limit the definition of a 'sexual performance' to a visual performance." Butler, 88 S.W.3d at 129. The Court reasoned that, although the victim's "presentation of sexual acts was not before a viewing audience, [Section] 568.080 prohibits the exploitation of young children in pornographic presentations." Id. at 130. In Blankenship, the Court noted that "[t]he legislature enacted [S]ection 568.080 to prevent the sexual exploitation of minor children," and concluded that "[r]estricting the application of [S]ection 568.080 to visual performances only would frustrate the purpose of the statute." Blankenship, 415 S.W.3d at 122.

Thus, the State was not required to show that Ragland watched the sexual performance. Instead, the State merely was required to present sufficient evidence showing that Ragland "employ[ed], authorize[d], or induce[d] a child less than seventeen years of age to engage in a sexual performance." Section 568.080.1. Neither the express elements of the crime as stated in Section 568.080.1 nor case law construing the statute required the State to show that Ragland watched J.F. and J.J. engage in sexual conduct in order to support a conviction for use of a child in a sexual performance.

We conclude that the State presented sufficient evidence supporting Ragland's conviction on two counts of use of a child in a sexual performance, one relating to J.J. and one to J.F. Evidence was presented at trial that Ragland showed J.J. how to perform oral sex and ordered J.J. and J.F., both children under the age of seventeen, to "suck each other's penises." Accordingly, the trial court did not clearly err in overruling Ragland's motion for judgment of acquittal at the close of all of the evidence. Point Four is denied.

IV.    Point Five—Jury Notetaking

Ragland argues that the trial court abused its discretion by denying his motion to allow the jury to take notes during trial. We disagree.

22

A.    Standard of Review

Rule 27.08 makes clear that the decision to allow or not allow juror note-taking lies purely within the sound discretion of the trial court. State v. Taylor, 134 S.W.3d 21, 28 (Mo. banc 2004). The trial court's decision to prohibit note-taking is not an abuse of discretion unless it was "clearly against the logic of the circumstances and was so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id.

B.    The trial court did not abuse its discretion.

Here, defense counsel did not request jury note-taking until after the first prosecution witness had testified at length, producing 51 pages of testimony. The State objected to defense counsel's request expressly because the trial had already begun and extensive testimony had already been heard by the jury without the benefit of note-taking.

The trial court denied defense counsel's request, noting its concern "that the first Witness's testimony might not be given equal weight with the testimony [the jury] would hear if they had the notepads." The trial court's rationale was entirely reasonable and logical given the circumstances. The trial court's decision to prohibit note-taking was not clearly against the logic of the circumstances, and it was not so arbitrary and unreasonable as to shock our sense of justice and indicate a lack of careful consideration. Point Five is denied.

Conclusion

The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, JUDGE

Sherri B. Sullivan, Presiding Judge and Lisa P. Page, Judge: Concur.

23