

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD85845** |
| | ) | |
| **v.** | ) | **OPINION FILED:** |
| | ) | **JANUARY 30, 2024** |
| **JOSHUA AARON LEWIS,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Kevin Crane, Judge

Before Division Four:  Gary D. Witt, Chief Judge, Presiding, Edward R. Ardini, Jr.,
Judge and Janet Sutton, Judge

Joshua Lewis ("Lewis") appeals a judgment of the Circuit Court of Boone County,

Missouri ("trial court"), convicting him, after a jury trial, of three counts of statutory

sodomy in the first degree, Section 566.062;[1] two counts of child molestation in the

second degree, Section 566.068; and one count of abuse or neglect of a child, Section

568.060.  Lewis was sentenced to consecutive terms of life imprisonment for each count

---

[1] All statutory references are to Missouri Revised Statutes (2016), as updated through 2020, unless otherwise noted.

of statutory sodomy in the first degree, ten years' imprisonment on each count of child molestation in the second degree, and seven years' imprisonment on the count of abuse or neglect of a child. Lewis raises two points on appeal and argues: Point I, the trial court abused its discretion in admitting C.H.'s out-of-court statements to Investigator in violation of Lewis's rights to due process and a fair trial under the Sixth and Fourteenth Amendments; and Point II, the trial court plainly erred in admitting C.H.'s out-of-court statements to Officer in violation of Lewis's rights to due process and a fair trial under the Sixth and Fourteenth Amendments. We affirm the judgment of the trial court.

## Factual and Procedural Background[2]

J.H., C.H., R.H., and D.H. are all siblings who began living with Lewis in 2016, after their biological parents were sent to prison. In 2016, J.H. was nine years old, C.H. was eight years old, R.H. was seven years old, and D.H. was three years old. The children did not know Lewis very well prior to moving in with him. About a year after the children moved in with Lewis, he began "whooping" the children and "cuddling" with J.H., C.H., and R.H. Lewis would "whoop" the children with a belt, a backscratcher, or his hand, and he would "whoop" D.H. worse than the others. One time, D.H. had an accident in the bathroom where he got feces on the floor and failed to clean it up since he did not know how to. D.H. left the mess and Lewis began screaming at him, bent D.H. over the couch in the living room, and pulled down D.H.'s pants and underwear. Lewis

---

[2] We review the evidence in the light most favorable to the jury's verdict. *State v. Vandergrift*, 669 S.W.3d 282, 291 n. 9 (Mo. banc 2023).

2

hit D.H.'s buttocks with a backscratcher numerous times which resulted in bleeding and bruises.

When C.H. was ten or eleven years old, Lewis asked her to cuddle with him on the couch in the living room. While they were watching television, Lewis reached under C.H.'s shirt and touched her breasts. Lewis told C.H. that she is "really beautiful" and that she "felt nice." When C.H. tried to pull away and move Lewis's hand, he stopped touching her.

When C.H. was ten years old, Lewis began asking to have sex with her. On multiple occasions, when C.H. was eleven or twelve years old, Lewis wanted C.H. to sleep in his bed, and he made C.H. lay down and sleep with him. Lewis would be naked or only wearing underwear. During one incident, while C.H. was trying to fall asleep, Lewis put his hand under C.H.'s shirt and touched her breasts. As C.H. pretended to wake up, Lewis stopped touching her and apologized. Another time, when C.H. was trying to sleep, Lewis began complimenting C.H. and asked if he could touch her "private parts." C.H. acted like she was asleep, but Lewis said, "I know you're up. You need to answer me." C.H. did not answer and Lewis put his hand down C.H.'s pants and touched her vagina for approximately one minute. C.H. started to cry and Lewis stopped, apologized, and told C.H. to take a shower. Another time when Lewis made C.H. sleep in his bed, C.H. woke up because she felt something on her shoulders. Lewis was naked on top of C.H. with his knees on her shoulders and his penis in C.H.'s mouth. On another occasion while C.H. was asleep, Lewis lifted C.H.'s shirt above her breasts. Lewis was

3

moving back and forth, saying, "Oh, that feels good" and "That was totally worth it." C.H. turned her face away, and pushed Lewis. Lewis put his clothes back on, pulled down C.H.'s shirt, and told her to shower. Occasionally, Lewis would masturbate when he touched C.H. and would ejaculate on her body.

The mornings after Lewis would touch C.H., he would often apologize and say, "You can't tell anybody about this because you don't know how much trouble I'll get in. I'll be sent to jail. And you don't want that, do you?" C.H. did not talk to her siblings about what was going on because she was too scared and because Lewis told her not to say anything.

Lewis also asked R.H. to sleep in bed with him. Lewis would lay down and cuddle R.H. with his stomach against her buttocks and Lewis's arm and leg wrapped around R.H. Sometimes when Lewis cuddled with R.H. he would be naked, and sometimes he had on underwear. Most of the time R.H. had her clothes on, unless Lewis told her to take them off. While cuddling, Lewis would touch R.H.'s vagina and breasts, and also try to put his penis in R.H.'s vagina.

During one incident, in the middle of the night, Lewis went to R.H.'s bedroom and asked her to go to the basement. Once downstairs, Lewis began talking to R.H. about how sex works. Lewis took off his pants, sat down, and told R.H. to sit on his lap. Lewis told R.H. he was going to try to put his penis in her "butt" and if R.H. did not sit on his lap, she would be in big trouble. R.H. saw Lewis's penis "sticking up" and he made her "sit right on it" as Lewis tried to put it in her "butt." Soon after, R.H. told Lewis no and

4

left to go back upstairs in her room. R.H. did not tell her siblings what happened because she was nervous.

C.H.'s friends at school started to notice her being "quiet and different," and they asked her what was going on. C.H. felt like she could trust her friends enough to tell them what was wrong, so she wrote them a letter. In the letter, C.H. explained how "[Lewis] has tried to rape all of us girls and he abuses us and he used to make us always have to sleep with him." In the letter, C.H. wrote, "Should I tell the cops everything? I don't want to only because there's a chance us kids would get split up. So I should just run away, but I would have nowhere to go because [Lewis] will find me. He always does." C.H. was walking home from school and gave the letter to her friend as they got close to Lewis's house.

A community member was walking the neighborhood when he saw a letter in the street. The community member found this letter in the same location C.H. attempted to give the letter to her friend. The community member read the letter and was "shocked" by its contents. On March 1, 2021, the community member emailed a copy of C.H.'s letter to a school counselor at the local school. After reading the letter, the school counselor believed it was C.H. who wrote it and called C.H. to her office. C.H. told the school counselor she wrote the letter and that its contents were true. As a mandated reporter, the school counselor made a report with Boone County Children's Division and made sure J.H. and R.H. did not leave school at the end of the day and that D.H. would be brought over to the sisters' school.

A police officer ("Officer") and a Children's Division investigator ("Investigator") arrived to the school to talk with C.H. and her siblings. Upon their arrival, C.H., J.H., and R.H. were in the school's office. With Officer and the school principal present, Investigator asked the children about the letter, and R.H. and J.H. looked at C.H. J.H. and R.H. were then asked to leave the room. Investigator conducted a cursory interview, asking C.H. basic questions about what happened, when it happened, who did it, and if she had talked to anyone else about it. In response, C.H. stated she wrote the letter and that an incident happened with Lewis in his bedroom. C.H. disclosed the incident happened more than once and that she thought something similar happened to R.H. C.H. did not go into details, so Officer asked a few follow-up questions. C.H. explained Lewis said inappropriate things to her and had touched her, motioning to her breasts, vagina, and buttocks. Officer then told Investigator that they needed to set up a forensic interview with the Children's Division.

The children attended forensic interviews, and Investigator performed a follow-up check-in with the children on March 24, 2021. During this follow-up, the children disclosed an additional incident of physical abuse by Lewis where Lewis beat D.H. on his bare buttocks with a back scratcher, leaving bleeding and bruising.

Lewis was charged with fourteen counts. Counts I, II, XII, and XIII charged that Lewis committed the offense of statutory sodomy in the first degree. Count III charged that Lewis committed the offense of enticement of a child. Counts IV, V, and XIV charged that Lewis committed the offense of child molestation in the second degree.

6

Counts VI, VII, VIII, IX, and X charged that Lewis committed the offense of abuse or neglect of child. Count XI charged that Lewis committed the offense of child molestation in the fourth degree. Counts I-V identified C.H. as the victim. Counts VI, VII, and XI identified J.H. as the victim. Counts VIII and XII-XIV identified R.H. as the victim. Counts IX and X identified D.H. as the victim.

Prior to trial, a section 491.075 hearing was conducted to determine the admissibility of the children's out-of-court statements to various individuals. Pertinent to this appeal, the trial court found "the time, content and circumstances" of C.H.'s statements to Investigator and Officer on March 1, 2021, "provide[d] sufficient indicia of reliability" to be admissible at trial.

At trial, Lewis objected to Investigator's testimony about C.H.'s out-of-court statements as improper hearsay under section 491.075, and the trial court overruled his objection. After the State rested its case in chief, Lewis filed a motion for judgment of acquittal as to all counts. The trial court granted Lewis's motion for acquittal at the close of the State's case as to counts III, VII, VIII, IX, XI, XII, and XIV. At the close of all of the evidence Lewis made a motion for judgment of acquittal as to all remaining counts, which was denied. The jury returned a verdict of guilty on three counts of statutory sodomy in the first degree, counts I, II, and XIII; two counts of child molestation in the second degree, counts IV and V; and one count of abuse or neglect of a child, count X. The jury recommended that Lewis be sentenced to life imprisonment on each count of statutory sodomy in the first degree, to ten years' imprisonment on both counts of child

7

molestation in the second degree, and to seven years' imprisonment on the count of abuse or neglect of a child.

On October 21, 2022, Lewis filed a motion for new trial alleging the trial court clearly erred in allowing Investigator to testify about C.H.'s out-of-court statements in violation of Lewis's rights under the Sixth and Fourteenth Amendments. On November 21, 2022, the trial court denied Lewis's motion, sentenced Lewis consistent with the sentences recommended by the jury, and ordered all of the sentences as to each count for which a conviction was entered to run consecutively. This appeal follows.

**Standard of Review**

Both of Lewis's points on appeal relate to the trial court's admission of C.H.'s out-of-court statements at trial; however, each point is addressed separately with a different standard of review. Point I alleged that the trial court abused its discretion in admitting C.H.'s out-of-court statements to Investigator in violation of Lewis's rights to due process and a fair trial under the Sixth and Fourteenth Amendments; and Point II alleged the trial court plainly erred in admitting C.H.'s out-of-court statements to Officer in violation of Lewis's rights to due process and a fair trial under the Sixth and Fourteenth Amendments. Finding no error, we affirm the judgment of the trial court.

As to Point I, trial courts have "broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion." *State v. Hollowell*, 643 S.W.3d 329, 336 (Mo. banc 2022) (internal citation omitted). A trial court abuses its discretion when its "ruling is clearly against the logic of

8

the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Antle*, 670 S.W.3d 66, 71 (Mo. App. W.D. 2023) (internal citation omitted). "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Ragland*, 494 S.W.3d 613, 622 (Mo. App. E.D. 2016) (internal quotation omitted). If the trial court abused its discretion, "a reviewing court will only reverse if the prejudice resulting from improper admission of evidence is outcome-determinative." *State v. Cole*, 483 S.W.3d 470, 474 (Mo. App. E.D. 2016). A prejudice is outcome-determinative when, "there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence." *State v. Johnson*, 477 S.W.3d 218, 226 (Mo. App. W.D. 2015) (internal quotations omitted).

As to Point II, this Court generally does not review unpreserved claims of error. *State v. Brandolese*, 601 S.W.3d 519, 526 (Mo. banc 2020). Under Rule 30.20,[3] this Court has the discretion to review "plain errors affecting substantial rights . . . when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

Plain error review is a two-step process:

The first step requires a determination of whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious, and clear. If plain error is found, the court then must proceed to the second step and determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

---

[3] All rule references are to Missouri Supreme Court Rules (2023).

*State v. Minor*, 648 S.W.3d 721, 731 (Mo. banc 2022) (internal citation omitted).

## Analysis

**Point I**

In his first point, Lewis alleges the trial court abused its discretion in admitting, over his objection, C.H.'s hearsay statements to Investigator in violation of his Sixth and Fourteenth Amendment rights because "the time, content, and circumstances of the statements did not provide a sufficient indicia of reliability as required by Section 491.075 as the statements were made in response to leading and suggestive questioning . . . ." We disagree and find the trial court did not abuse its discretion in admitting C.H.'s statements to Investigator.

Under section 491.075:

1. A statement made by a child under the age of fourteen, or a vulnerable person, relating to an offense under chapter 565, 566, 568 or 573, performed by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:
(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
(2)(a) The child or vulnerable person testifies at the proceedings . . . .

Our courts apply a "totality-of-the-circumstances test" when making a reliability determination as required by section 491.075.1. *See Antle*, 670 S.W.3d at 71. When considering the totality of the circumstances, we consider the following non-exclusive list of factors: "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) the lack of motive to fabricate; and (4) knowledge of subject matter

10

unexpected of a child of similar age." *State v. Henderson*, 643 S.W.3d 545, 553 (Mo. App. W.D. 2021) (citation and internal quotation mark omitted).

Here, C.H. was under the age of fourteen when the statements were made, the offenses arose under Chapter 566 and Chapter 568, the testimony was likely otherwise inadmissible hearsay, and C.H. testified at trial. The trial court held a 491 hearing, however, Lewis argues C.H.'s statements were improperly admitted at trial because there were not sufficient indicia of reliability surrounding the statements. Lewis argues these statements were not spontaneous or made without prompting because Investigator and the other adults present were engaging in a confrontation with C.H. over the letter. Lewis asserts C.H. likely had a strong motive to fabricate her response as she was confronted by several adults about the letter, and it is likely C.H. felt a certain type of response was demanded, and her failure to adhere would result in discipline. Because of this, Lewis claims, C.H. likely felt she had to continue repeating these allegations, regardless of whether they were true, or risk harsher consequences for having the initial lie revealed.

Under the totality of the circumstances, C.H.'s statements to Investigator had sufficient indicia of reliability and the trial court did not abuse its discretion in admitting them. The letter C.H. wrote contained an initial disclosure describing how "Lewis has tried to rape all of us girls and he abuses us." Unprompted, C.H. wrote this letter intending to give it to her two friends, trusting that these friends would not share this information because it was "not a joke," and C.H. did not know what to do. *See State v. Sprinkle*, 122 S.W.3d 652, 661-62 (Mo. App. W.D. 2003) ("The question is not where the

11

statements were made, but rather whether the victim was prompted or pressured to make the disclosures or whether the victim freely volunteered them.").  When Investigator was called to the school and began talking to C.H. he "didn't want to push her too much" as the letter already contained a disclosure about sexual and physical abuse.  Thus, Investigator began asking standard cursory questions about "who did it and where did it happen at and does anyone else know about it and when was the last time it happened." C.H. confirmed that she wrote the letter and said there was an incident with Lewis in the bedroom of their home, which happened more than once.  C.H. stated Lewis would make inappropriate comments to her but did not go into details.  Investigator asked C.H. if Lewis touched her over or underneath her clothing, and C.H. stated she was touched both over and underneath her clothing.

Investigator's questions following C.H.'s confirmation of the initial disclosure did not amount to suggestive questioning rendering C.H.'s statements unreliable.  *See State v. Thompson*, 341 S.W.3d 723, 730 (Mo. App. E.D. 2011) (holding counsel's questioning techniques did not render child victim's statements unreliable as counsel was seeking details such as where and how the incident occurred).  C.H.'s statements to Investigator were consistent with her videotaped forensic interview testimony which was introduced into evidence, as well as her in-court testimony.  The fact that C.H. added details in subsequent conversations as she recounted the various incidents does not render her statements inconsistent.  *See Ragland*, 494 S.W.3d at 624 ("Not only is it common for children's accounts of the abuse to contain some variations, contradictions or lapses in

12

memory, but Missouri courts have noted that there is a fundamental difference between inconsistency and describing different details at different times.")(internal quotation marks omitted).  Lewis does not claim C.H.'s mental state at the time rendered her statements unreliable, but he claims C.H. had a motive to fabricate her statements.  At the 491 hearing, however, Lewis did not present any evidence that C.H. had a motive to fabricate her story.  *See State v. Nelson*, 465 S.W.3d 533, 541 (Mo. App. S.D. 2015) (noting lack of motive to fabricate weighs in favor of reliability).  Thus, we find C.H.'s statements to Investigator were sufficiently reliable, and the trial court did not abuse its discretion in admitting C.H.'s statements to Investigator.  *See Thompson*, 341 S.W.3d at 730.

Point I is denied.

**Point II**

In his second point, Lewis alleges the trial court plainly erred in admitting C.H.'s hearsay statements to Officer in violation of his Sixth and Fourteenth Amendment rights because "the time, content, and circumstances of the statements did not provide. . . sufficient indicia of reliability as required by Section 491.075 as the statements were made in response to leading and suggestive questioning . . . ."  While Lewis concedes he failed to preserve this issue on appeal, he urges this Court to review for plain error.

We decline plain error review because Lewis's claim does not facially establish substantial grounds for believing that a miscarriage of justice or manifest injustice has resulted.  *See* Rule 30.20.  Even if C.H.'s statements to Officer were erroneously

admitted, Lewis was not prejudiced. "[*P*]*rejudice will not be found* from the admission of hearsay testimony where the declarant was also a witness at trial, testified on the same matter, and was subject to [cross-examination] because the primary defects in hearsay testimony are alleviated." *See State v. McClure*, 482 S.W.3d 504, 508 (Mo. App. W.D. 2016) (internal citation omitted). Here, C.H. testified at length during the trial about the same subject matter contained in her statements to Officer and she was cross-examined. Further, Officer's testimony was consistent with the testimonies of Investigator and C.H., which were also before the jury. Therefore, Lewis has not and cannot establish substantial grounds to suggest that a miscarriage of justice or manifest injustice has resulted, so we decline to review the point under plain error. *Id.*

Point II is denied.

## Conclusion

We affirm the judgment and sentence of the trial court.

_____
Gary D. Witt, Judge

All concur

14