

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD85148** |
| **v.** | ) | |
| | ) | **OPINION FILED:** |
| | ) | **May 14, 2024** |
| **JEREMY BAUM,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Johnson County, Missouri**
**The Honorable R. Michael Wagner, Judge**

**Before Division Three:** Alok Ahuja, Presiding Judge, and
Karen King Mitchell and Edward R. Ardini, Jr., Judges

Jeremy Baum appeals, following a jury trial, his convictions of sexual trafficking of a child in the second degree, § 566.211,[1] and promoting a sexual performance by a child, § 573.205, for which he was sentenced (with other convictions not at issue in this appeal) to a total of twenty-seven years' imprisonment.[2] Baum raises five claims on appeal, all directed at the sufficiency of the evidence presented at trial. Points I and V

---

[1] All statutory references are to the Revised Statutes of Missouri (Supp. 2019).

[2] Baum was also convicted of one count of second-degree statutory rape, § 566.034, and five counts of second-degree statutory sodomy, § 566.064. He does not challenge any of those convictions in this appeal.

challenge the sufficiency of the evidence to support both a conviction (Point I) and a

verdict director (Point V) for sexual trafficking. Baum suggests that, because the

evidence established that he was a participant in the acts alleged to be a sexual

performance, he could not also be the audience and, without an audience, the conduct

could not amount to a performance as required for the crime of sexual trafficking. In

Points II, III, and IV, he challenges the sufficiency of the evidence to support both a

conviction (Points II and III) and a verdict director (Point IV) for promoting a sexual

performance. Baum argues that (1) the conduct underlying the charge was insufficient to

prove a sexual performance and (2) what evidence there was showed the conduct

occurred in Florida, rather than Missouri, and did not support a finding that he directed

Victim to engage in a sexual performance. As laid out below, we do not believe any of

Baum's points on appeal merit relief and would ordinarily affirm. But, given the nature

of the disagreement between the majority and dissent, we believe this case raises issues

of general interest and importance. Therefore, rather than enter a final decision affirming

Baum's convictions, we transfer this matter to the Missouri Supreme Court pursuant to

Rule 83.02.

## Background[3]

Victim became Baum's stepdaughter after her mother and Baum married when

Victim was two years old. Victim knew Baum as "dad" for her entire childhood. Baum

---

[3] Because Baum challenges the sufficiency of the evidence supporting his convictions, we "must examine 'the evidence and inferences in the light most favorable to the verdict, ignoring all contrary evidence and inferences.'" *State v. McCord*, 621 S.W.3d 496, 498 (Mo. banc 2021) (quoting *State v. Niederstadt*, 66 S.W.3d 12, 14 (Mo. banc 2002)).

2

and Mother divorced in 2015. After the divorce, Baum lived in Florida with Victim and Victim's half-brother (Brother) while Mother remained in New Mexico.

When Victim was fifteen years old, Baum became more physically affectionate; it began with Baum insisting that they nap together. Sometimes Baum would wrap his arms around Victim, and other times, he would have Victim lie on top of him. Victim did not want to nap with Baum, but she also did not want to upset him. Baum began kissing Victim longer than she was comfortable with and holding her hand in public. At one point, a family friend (Friend) observed Baum and Victim napping together when Victim was lying on top of Baum, and she expressed some concern to Baum; Baum did not see any problem with a father showing affection to his child. Friend also observed Victim wrap her arms around Baum in a way that was more symbolic of a romantic than familial relationship, and Friend again expressed concern to Baum. Baum made Friend feel that she was overreacting by suggesting that her concern arose only because Baum was a dad and that such behavior by a mom would not have been questioned.

Baum eventually began discussing masturbation with Victim; he claimed that he did so because he found a woman's razor in Victim's bed and assumed she had been using the handle for masturbation, though there is no evidence that this assumption was accurate. Victim was uncomfortable with the discussions, but Baum made her feel that it was a normal thing to discuss. She was expected to "keep him in the loop" and they had conversations about her own masturbation. Baum told Victim about his experiences with other women and how they were pleasured, and he purchased a hot pink vibrator for Victim to use. Baum taught Victim how to charge and operate the vibrator and suggested

3

where and how she could use it to feel good. Victim was then expected to use the vibrator in private in the manner Baum had instructed. Baum also advised Victim that the vibrator was for external use, and she should tell him if she was ever interested in anything for internal use so he could obtain something for her.

Baum mentioned to Friend that he had discussed masturbation with Victim, claimed that Victim asked him how to do it, and then said he did not know how to respond, so he explained to Victim how he had pleasured women in the past. Friend told Baum that he had crossed the line by sexualizing himself to his daughter. Baum again accused her of overreacting because he was a dad rather than a mom, and they never discussed it again. Friend was not aware that Baum had purchased a vibrator for Victim.

Shortly thereafter, in October of 2018, Baum, Victim, and Brother moved from Florida to Warrensburg, Missouri; Victim was sixteen years old at the time. Baum's behavior with Victim not only continued but also escalated after the move. Victim began spending the night in Baum's bedroom, where they engaged in mutual masturbation, with Victim touching Baum's genitals while he touched hers or used the vibrator on her. During these times, Baum would direct Victim "where to please [her]self" and how to position her body; Baum also directed her manipulation of his genitals, suggesting "[w]here to put [her] hands, how fast to do it, when [she] needed to add lubrication." Baum praised Victim, telling her she was brave and how much he loved her. Baum "would tell [Victim] how beautiful [she] was. He would comment on [her] body. He would tell [her] how wet [she] was and how grown up [she] was as well." Victim continued to comply with Baum's requests because she did not want to upset him.

4

Baum's requests expanded from digital manipulation to oral; he began using his mouth on Victim's genitals and asked her to use her mouth on his genitals as a way of "giving back." Victim was very uncomfortable with Baum using his mouth on her genitals, and Baum became upset and offended, indicating that he was very good at oral stimulation with other women and did not understand why Victim was not enjoying it. Victim felt terrible for upsetting Baum. Baum also attempted to vaginally penetrate Victim with his penis on two occasions but stopped because Victim said it hurt.

Baum took precautions to prevent Brother from discovering his activities with Victim. At night, Baum instructed Victim to go to bed in her room where she would wait for him to come get her after Brother had gone to sleep, and then Baum would close his bedroom door behind them. In the morning, Baum would get up first and check to see if Brother was awake; if he was, then Baum would distract Brother so that Victim could return to her own room and pretend to still be sleeping.

Despite Baum's efforts, Brother noticed some things that caused him concern. He saw Victim's hot pink vibrator charging on the floor of Baum's bedroom. One night when no one other than Baum, Victim, and Brother were home, Brother heard female "sex noises" coming from Baum's bedroom even though the lights and the television were off. And, on another occasion in May of 2020, Brother noticed Victim and Baum go into the downstairs bathroom together where they remained for a long time, prompting Brother to call Mother.

In response to Brother's phone call, Mother drove from New Mexico to Missouri, where she contacted the local police. The police told Mother to drive to the home, pick

5

up Victim and Brother, and take them straight to Sedalia for forensic interviews. After the forensic interviews, Mother took Victim and Brother back to New Mexico with her.

Subsequent investigation led to a search of Baum's home, where officers discovered "a small pink vibrator as well as a large black, . . . three-prong vibrator, [and multiple] bottles of lubrication." Both vibrators contained a mixture of DNA, but Victim was the major contributor on the pink one and Baum was the major contributor on the black one. The State charged Baum with one count of sexual trafficking of a child in the second degree, one count of promoting a sexual performance by a child, one count of second-degree statutory rape, and six counts of second-degree statutory sodomy.

At trial, Baum testified in his own defense. Baum admitted buying Victim a vibrator and teaching her how it worked in accordance with the manufacturer's instructions. Baum denied all other allegations.

Following the close of evidence, the State dismissed one of the second-degree statutory sodomy counts, but the remaining charges were submitted to the jury. The jury found Baum guilty as charged on the remaining counts. Baum waived jury sentencing, and the court sentenced him to twenty years' imprisonment for sexual trafficking of a child, eight years for promoting a sexual performance, seven years for statutory rape, and seven years for each count of statutory sodomy. The court ordered the trafficking and statutory rape sentences to run consecutively and the promotion of a sexual performance and statutory sodomy sentences to run concurrently for an aggregate sentence of twenty-seven years. Baum appeals.

6

## Standard of Review

In Points I, II, and III, Baum challenges the sufficiency of the evidence to support his convictions in Counts I and II (second-degree trafficking of a child and promoting a sexual performance by a child, respectively). In Points IV and V, he challenges the sufficiency of the evidence to support submission of the verdict directors for Counts I and II to the jury. "As a practical matter, the test for determining the sufficiency of the evidence to convict . . . and for determining the sufficiency of the evidence to support the giving of a verdict director . . . is ultimately the same[:] 'Did the State make a submissible case?'" *State v. Bradshaw*, 26 S.W.3d 461, 465 (Mo. App. W.D. 2000). Therefore, our standard of review for all of Baum's points is the same.

Our review of "a challenge to the sufficiency of the evidence supporting a criminal conviction is limited to a determination of whether the trier of fact reasonably could have found the defendant guilty." *State v. Blankenship*, 415 S.W.3d 116, 121 (Mo. banc 2013). In conducting this review, "[a]ll evidence and inferences favorable to the State are accepted as true, and all evidence and inferences to the contrary are rejected." *State v. Porter*, 439 S.W.3d 208, 211 (Mo. banc 2014). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979), *superseded on other grounds by* 28 U.S.C. § 2254(d).

**Analysis**

In Points I and V, Baum challenges the sufficiency of the evidence presented at trial to support both his conviction of and the verdict director for sexual trafficking of a child. In Points II, III, and IV, Baum challenges the sufficiency of the evidence presented at trial to support both his conviction of and the verdict director for promoting a sexual performance. For ease of discussion, we address his points out of order.

**I.     There was sufficient evidence to support Baum's conviction for sexual trafficking of a child in the second degree.**

In his first point on appeal, Baum argues that the State did not present evidence to support his conviction for sexual trafficking of a child in the second degree insofar as Baum's actions with Victim "did not constitute a 'sexual performance.'" We disagree.

"A person commits the offense of sexual trafficking of a child in the second degree if he . . . knowingly . . . entices . . . a person under the age of eighteen to participate in . . . a sexual performance[.]" § 566.211.1(1). Baum does not challenge Victim's age, his mental state, or whether his conduct constituted enticement; instead, his sole challenge is directed at whether Victim's conduct amounted to a "sexual performance."

A "sexual performance" is "any . . . exhibition which includes sexual conduct . . . , performed before an audience of one or more, whether in person or online or through other forms of telecommunication." § 566.200(15). Baum argues that none of the conduct he or Victim engaged in constituted a sexual performance because a sexual

8

performance requires an audience and he could not be both audience and participant. We disagree.

For the purpose of § 566.211.1(1), a "sexual performance" need not be public, *State v. George*, 717 S.W.2d 857, 859 (Mo. App. S.D. 1986); and need not be visually observed by the intended audience, *Blankenship*, 415 S.W.3d at 122; *State v. Ragland*, 494 S.W.3d 613, 629-30 (Mo. App. E.D. 2016); *State v. Butler*, 88 S.W.3d 126, 129-30 (Mo. App. S.D. 2002). Instead, the focus of the statute is on the child's anticipated behavior in response to some manner of instigation by the defendant. *See* § 566.200(15) (defining "sexual performance" as an "exhibition [that] includes sexual conduct"); *State v. Hartwein*, 648 S.W.3d 834, 851 (Mo. App. E.D. 2022), *cert. denied*, 143 S. Ct. 2444 (2023) (defining "entice" as "to incite, instigate") (quoting *Webster's Third New International Dictionary of the English Language Unabridged* 757, 913 (2002)). Thus, evidence that a defendant "instructed [the v]ictim on multiple occasions to masturbate," and "coached [the v]ictim how to stimulate herself sexually by touching her body" constituted sufficient evidence of "a substantial step toward the use of a child in a sexual performance." *Blankenship*, 415 S.W.3d at 123.[4] And "requir[ing a] child to perform [while the defendant] watche[s]," making the defendant "as much director as . . . audience" establishes sufficient evidence of a "sexual performance." *George*, 717 S.W.2d at 859.

---

[4] It appears that the only reason the charged crime in *Blankenship* was an attempt, rather than a completed offense, was because the recipient of the defendant's instructions was neither a child nor actually engaged in the requested sexual conduct. Here, Victim was an actual compliant child who followed the same directions given in *Blankenship* when given by Baum.

Here, Victim testified that, after they moved to Missouri, she began spending the night in Baum's bedroom, where they engaged in what she called "mutual masturbation," including Baum directing Victim how to position her body and where to please herself, making him both director and audience. The fact that Baum was also a recipient of sexual contact in the same time frame does not eviscerate his role as audience when Victim masturbated in front of him.[5] The evidence that Baum offered Victim suggestions on where to please herself and how to position her body supports a reasonable inference that Baum was observing Victim, just as the defendant in *George* "carefully view[ed] the occurrences" he directed.[6] 717 S.W.2d at 859. Therefore, regardless of what else was happening at the time, Baum remained an audience of Victim's masturbation.

The dissent claims "there is literally _no_ evidence in the record that Baum 'enticed Victim to masturbate in front of him while he watched.'" (Dissent op. at 2). While the dissent is correct that no witness expressly stated, "Baum enticed Victim to masturbate in

---

[5] Though audience members often simply observe performances they attend, they also frequently participate in performances. For example, they might volunteer in a magic show, sing along during a concert, or be the recipient of an erotic dance. In none of these scenarios do the audience members cease being part of the audience simply as a result of participation with the performers. Baum could have been doing any number of things—including masturbating himself—while observing Victim, and none of it would have negated his role as audience of Victim's own masturbation. *See, e.g., State v. Butler*, 88 S.W.3d 126, 128 (Mo. App. S.D. 2002) (noting that the defendant's pants were unzipped when officers located him alone in his car by the payphone where the calls to the victim originated, yet still holding the evidence sufficient to support a finding that the defendant was the audience of a sexual performance).

[6] In making this observation, we do not suggest that a person must visually observe a performance to be an audience; both *Blankenship* and *Butler* hold otherwise. *State v. Blankenship*, 415 S.W.3d 116, 122 (Mo. banc 2013); *Butler*, 88 S.W.3d at 129-30. While visual observation is unnecessary, where (as here) the evidence supports a finding that the defendant watched the child engage in sexual conduct, a performance occurred before an audience. *State v. George*, 717 S.W.2d 857, 859 (Mo. App. S.D. 1986).

10

front of him while he watched," sufficiency review requires that we view *both* the evidence *and* the reasonable inferences therefrom in the light most favorable to the State. Victim's express testimony established that, while Baum and Victim were in the same room together, Baum was "[t]elling [Victim] where to please [her]self, [her] position, things like that." As discussed above, the evidence that Baum offered Victim suggestions for improving her self-masturbation technique, by directing her where to please herself and how to position her body, viewed in the light most favorable to the State, supports a reasonable inference that Baum was watching Victim while she masturbated.

Baum acknowledges that, "if one person masturbated while the other one watched, that may very well constitute a performance" but then argues that "there was no evidence that [Baum] ever took pleasure from watching [Victim] masturbate while they were engaged in mutual masturbation," and, therefore, Baum's observation of Victim's masturbation did not make *him* an audience. Nothing in § 566.211.1(1) requires the observer to take pleasure in watching, and his suggestion that Victim's masturbation while he observed did not amount to a "sexual performance" is directly contrary to the Missouri Supreme Court's holding in *Blankenship* that instructing a child to masturbate and coaching a child on how to do so would support a conviction for the use of a child in a sexual performance. *Blankenship*, 415 S.W.3d at 123.

In short, the evidence here supported the reasonable inference that Baum enticed Victim to masturbate in front of him while he watched. And that evidence is sufficient to

11

establish a sexual performance as defined in § 566.200(15).[7] Thus, the evidence was sufficient to support Baum's conviction of trafficking a child in the second degree.[8]

Therefore, we would deny Point I.

## II. Baum has failed to identify any instructional error warranting relief.

In Point V, Baum recasts his insufficiency of the evidence argument from Point I by shifting his focus to the verdict-directing instruction for sexual trafficking. But, in both Points I and V, Baum makes the same argument—that Victim's testimony did not demonstrate that Baum enticed Victim to "engage in a sexual performance." For the reasons set out above, we disagree.

The basis for Baum's claim that the verdict-director should not have been given here is that the evidence presented at trial was not sufficient to support it. Thus, just like Baum's

---

[7] Because the evidence of Victim's masturbation in front of Baum at his direction was sufficient to support his conviction for trafficking a child in the second degree, we need not consider the merits of his argument that mere exposure of a child's genitals during an incident of sexual abuse would be an overbroad interpretation of "sexual performance."

[8] The dissent faults our analysis for affirming Baum's conviction "based on different conduct than the jury relied on to convict him." (Dissent Op. at 1). That assertion is based on language in the verdict-director suggesting that the "sexual performance" occurred when Baum and Victim "masturbate[ed] each other in the same room." The dissent claims that our analysis conflicts with *State v. Marks*, 670 S.W.3d 135 (Mo. App. W.D. 2023). But there are two major flaws in the dissent's argument. First, we noted in *Marks* that, while "a defendant may not be charged with one form of an offense and convicted of another, . . . th[at] principle relates to the variance between the charging document and the jury instructions . . . . *It does not affect the sufficiency analysis*." *Id*. at 141 (emphasis added). Second, the dissent ignores Baum's own, *repeated* acknowledgement that "[a] reviewing court bases its determination on the sufficiency of the evidence based on the way the defendant is charged, *not the way the jury was instructed*." (App. Br. 21-22, 26) (emphasis added) (citing *State v. Zetina-Torres,* 482 S.W.3d 801, 809 (Mo. banc 2016). And, even if—contrary to Baum's own assertion—we were to base our determination of sufficiency on the way the jury was instructed, as the dissent suggests, there is no question that, in this case, there was sufficient evidence to prove that Baum and Victim masturbated each other in the same room as alleged in the verdict-director. Thus, we need not address the dissent's lengthy discussion of United States Supreme Court cases addressing due process violations in the context of instructional error.

12

challenge in Point I, his claim in this point relates solely to the sufficiency of the evidence to support his conviction.[9]  He argues, "the claimed error shows that [the] conviction is based on [a] verdict director based on *insufficient evidence*."  (App. Br. 49) (emphasis added).[10]  The only relevant law he relies on addresses the required evidentiary support for jury instructions: "A jury instruction *must be supported by substantial evidence* and the reasonable inferences to be drawn therefrom." (App. Br. 54) (emphasis added) (quoting *State v. Hallmark,* 635 S.W.3d 163, 171 (Mo. App. E.D. 2021)).  Even his claim of manifest injustice is directed at the sufficiency of the evidence when he argues, "to allow a conviction based on a verdict director *not supported by substantial evidence* constitutes a manifest injustice."  (App. Br. 50) (emphasis added).  And, though, in the alternative, he requests plain error review, his entire focus remains on the sufficiency of the evidence (for which plain error review is inapplicable).[11]

We have already determined in Point I that the evidence was sufficient to support Baum's conviction of second-degree trafficking of a child in that the evidence and reasonable inferences therefrom, support the conclusion that Baum enticed Victim to masturbate in front of him while he watched; thus, there was sufficient evidence that Baum

---

[9] "As a practical matter, the test for determining the sufficiency of the evidence to convict . . . and for determining the sufficiency of the evidence to support the giving of a verdict director . . . is ultimately the same[:]  'Did the State make a submissible case?'"  *State v. Bradshaw*, 26 S.W.3d 461, 465 (Mo. App. W.D. 2000).

[10] Though Baum made these assertions under Point IV, he expressly incorporated his arguments regarding preservation and the standard of review from Point IV into Point V.  (App. Br. 53).

[11] *See State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. banc 2015) ("Sufficiency of the evidence is reviewed on the merits, not as plain error.").

enticed Victim to engage in a sexual performance, as the instruction required the jury to find. The instruction also required the jury to find that Baum and Victim "masturbate[ed] each other in the same room." There is no question that evidence was presented from which the jury could have concluded that this conduct occurred. Thus, there was sufficient evidence to support a conviction of sexual trafficking as instructed.

It is tempting to recast Baum's Point V as a challenge to the *form* of the instruction, but giving in to this temptation would improperly turn this court into Baum's advocate, given that his only challenge is to the *giving*, rather than the *form*, of the instruction. And a challenge to the sufficiency of the evidence to support an instruction is ***not*** the same as a challenge to the form of the instruction. *See, e.g., State v. Cummings*, ED 111089, 2024 WL 1161871, at *5 (Mo. App. E.D. Mar. 19, 2024) ("Cummings cannot transform his evidentiary claim into a claim of instructional error."); *State v. Hughes*, 84 S.W.3d 176, 180 (Mo. App. S.D. 2002) (declining to reframe the appellant's instructional challenge on appeal from one directed at the sufficiency of the evidence to one directed at the form of the instruction). "It is not proper for the appellate court to speculate as to the point being raised by the appellant and the supporting legal justification and circumstances." *Boyd v. Boyd*, 134 S.W.3d 820, 823 (Mo. App. W.D. 2004). "To do so would cast the court in the role of an advocate for the appellant, which we cannot be." *Id*. at 824. Instead, our "role is to review specifically challenged trial court rulings, not to sift through the record to detect possibly valid arguments." *Smith v. City of St. Louis*, 395 S.W.3d 20, 29 (Mo. banc 2013).

14

Despite the alternative request for plain error review, Baum's Point V does not identify *any* error in the *form* of the instruction. Though his argument *alludes* to a question of statutory interpretation (whether "mutual masturbation," occurring "by [Baum and Victim] masturbating each other in the same room," as described by Victim and alleged in the verdict director constitutes a "sexual performance"), he still couches his claim as a challenge to the sufficiency of the evidence: "there is *no evidence* that [Baum] and [Victim] engaging in mutual masturbation constituted a sexual performance." (App. Br. 54) (emphasis added). Baum never claimed that the instruction's language was erroneous in any way.

As further proof that his challenge does not involve the *form* of the instruction, Baum's argument focuses on whether there was sufficient evidence of "mutual masturbation," but the actual language of the verdict director uses the phrase, "masturbating each other in the same room"; the phrase "mutual masturbation" does not appear within the verdict director. Baum's Point V never addresses the actual language of the verdict director for sexual trafficking. Furthermore, Baum's requested relief on Point V is that "[t]his court should reverse [his] conviction . . . and order him discharged on this Count." Such relief would be appropriate only if his challenge to the sufficiency of the evidence prevailed. Were he challenging the form of the instruction, the proper relief to seek would be a reversal and remand for a new trial with a properly instructed jury. *State v. Neal*, 328 S.W.3d 374, 383 (Mo. App. W.D. 2010) ("The general rule is that the remedy for instructional error is to remand the case for a new trial.").

In short, Baum has not challenged the *form* of the instruction as erroneous in any way. And, because the first step in plain error review is identifying an error that is "evident, obvious, and clear," *State v. Minor*, 648 S.W.3d 721, 731 (Mo. banc 2022) (quoting *Grado v. State*, 559 S.W.3d 888, 899 (Mo. banc 2018)), where *no* error—of any kind—is raised, there is nothing to review. Because Baum alleged no error with respect to the *form* of the verdict-director and his challenge to the *giving* of the verdict-director is without merit, there is nothing else to review, plain or otherwise.

Therefore, we would also deny Point V.[12]

### III. There was sufficient evidence to support both the conviction and verdict director for promoting a sexual performance.

In Points II and III, Baum argues that the evidence was insufficient to support his conviction for promoting a sexual performance insofar as Victim's private use of the pink vibrator did not constitute a "sexual performance" (Point II) and, even if it did, none of the relevant conduct occurred in Missouri (Point III). We disagree.

---

[12] The dissent mischaracterizes our analysis as suggesting that, because Baum failed to raise a challenge to the form of the instruction, "he cannot challenge the verdict director in *any* fashion – either as a sufficiency-of-the-evidence claim, or as a claim of instructional error." (Dissent Op. at 11). That is simply inaccurate. Baum raised a claim of instructional error, but he chose to frame it as one challenging the *giving* of an instruction based on insufficient evidence. Because we already determined in Point I that the evidence was sufficient to support the conviction, his instructional challenge based on insufficient evidence is simply meritless. What the dissent wants to analyze is a claim that Baum ***did not raise***—specifically, an allegation of error in the *form* of the instruction insofar as it suggested that the conduct alleged ("masturbating each other in the same room") satisfied the definition of "sexual performance." There is **no claim** in Baum's brief that the form or language of the verdict-director for second-degree trafficking was erroneous *in any way*. Nonetheless, the dissent seeks to *both* raise this claim on Baum's behalf *and* find in his favor under the auspices of plain error review. Because the appellate court may not insert itself as an advocate on behalf of any party, we refuse to address the claim first raised *by the dissent* rather than either party to the appeal. Because the claim, *as presented*, in Point V is without merit, we would deny it.

"A person commits the offense of promoting a sexual performance by a child if, knowing the character and content thereof, the person . . . directs any performance which includes sexual conduct by a child less than eighteen years of age." § 573.205.1. For the purpose of § 573.205.1, a "performance" is "any . . . exhibition performed before an audience of one or more." § 573.010(13). Baum does not dispute either Victim's age or that masturbation constitutes sexual conduct. Instead, he argues that the State failed to prove both that he directed a performance and that a performance occurred because Victim was alone in her room when she used the vibrator.[13]

With respect to directing a performance, Baum argues the dictionary definition of "direct" implies "that the person who is directing the performance is doing so *as the performance is going on*," and because Victim testified that she used the vibrator privately *after* receiving instructions from Baum, there was neither directing nor an audience, such that there could be no "performance" for purposes of § 573.205.1.

Baum's argument, however, is contrary to Missouri law. With respect to Baum's argument that directing must be simultaneous with performing, we disagree. In *Blankenship*, the defendant directed, through email, that a child "perform specific sexual acts and report to him that she had completed these acts." 415 S.W.3d at 118. After the law enforcement officer posing as the victim responded, indicating the acts were

---

[13] The dissent suggests that we should apply the rule of lenity here due to the possibility of "exhibition" having multiple meanings. But "[t]hat rule applies only when a criminal statute contains a 'grievous ambiguity or uncertainty,' and 'only if, after seizing everything from which aid can be derived,' the Court 'can make no more than a guess as to what [the legislative body] intended.'" *Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (quoting *Muscarello v. United States,* 524 U.S. 125, 138–139 (1998)). As evidenced by our analysis, that is not the case here.

17

complete, the defendant would again direct performance of other acts and request a response when the acts were completed. *Id*. at 119. At one point, "Defendant also instructed [v]ictim to masturbate while thinking of him and to tell him about it *the next day*." *Id*. (emphasis added). The defendant continued to engage in the back and forth with the officer over the course of 67 emails over a three-month time span. *Id*. Because the defendant was communicating solely through email, there was no possibility of simultaneous direction as Baum claims the statute requires. Yet the Missouri Supreme Court still held that the evidence was sufficient "to find Defendant attempted to use a child in a sexual performance." *Id*. at 122. But for the fact that there was no child involved (there was a law enforcement officer impersonating a child) and no one actually engaged in the sexual conduct the defendant requested, the conviction would have been for the completed offense, rather than simply an attempt. Thus, we reject Baum's argument that directing must be simultaneous with any performance.

We also reject Baum's claim that there was no audience simply because he was not physically present to watch Victim when she followed his instruction. A perpetrator need not visually observe the child for there to be a sexual performance, nor does the perpetrator need to be physically present. *Blankenship*, 415 S.W.3d at 118-19 (performance directed by email); *Butler*, 88 S.W.3d at 127 (performance directed by telephone); *Ragland*, 494 S.W.3d at 629 (no evidence that the defendant was present when directions were performed). Here, Victim testified that there were times when she had to talk to Baum about things that she did not want to talk about. Specifically, that Baum directed Victim to "keep him in the loop" regarding her vibrator usage and that

18

they "would have conversations about [her] masturbation," making him an audience of her private performance in the same way the defendant in *Blankenship* was an audience when he "requested [that the v]ictim perform specific sexual acts and *report to him that she had completed these acts*." *Blankenship*, 415 S.W.3d at 118 (emphasis added).[14] Therefore, the fact that Victim used the vibrator privately in her room after Baum directed her to do so does not render the evidence insufficient. Because the evidence was sufficient to support Baum's conviction of promoting a sexual performance by a child, we would deny Point II.

---

[14] The dissent criticizes our reliance on *Blankenship* because it "was decided at a time when 'performance [was] not defined statutorily.'" (Dissent op. at 14) (quoting *Blankenship*, 415 S.W.3d at 121). But this argument ignores the fact that *Blankenship* relied on the plain and ordinary meaning of performance as "presentations, especially a theatrical one, before an audience." *Id*. at 122 (quoting *George,* 717 S.W.2d at 859). That definition was later adapted by the legislature in § 573.010(13) as "any . . . exhibition performed before an audience of one or more."

And, despite the fact "that we are constitutionally bound to follow the Missouri Supreme Court's most recent controlling decision on an issue," *State v. Escobar*, 523 S.W.3d 545, 554–55 (Mo. App. W.D. 2017), the dissent suggests that this definition "torture[s] the language" in such a way as to make sexual trafficking an "add-on" for every sexual offense. (Dissent op. at 15). The basis for the dissent's assertion is that the other offenses for which Baum was convicted carried a maximum penalty of seven years, while sexual trafficking is punishable for "not less than ten years or life and a fine not to exceed two hundred fifty thousand dollars." § 566.211.3. But the only reason Baum's other offenses were subject to a maximum of seven years' imprisonment was because of Victim's age. If Victim had been under 14, Baum would have been facing similar sentences for the same additional offenses of statutory rape and statutory sodomy but in the first degree—"life imprisonment or a term of years not less than five years." §§ 566.032.2, 566.062.2.

Additionally, we reject the dissent's characterization of Baum's other offenses as "underlying." Sexual trafficking is a distinct offense from statutory rape and statutory sodomy and is not dependent upon either as an "underlying" or predicate offense for conviction. The elements of the offenses differ, and, here, they were based on distinct conduct. It appears that the dissent is again reaching for a legal analysis inapplicable to a sufficiency-of-the-evidence challenge. *See, e.g., State v. Liberty*, 370 S.W.3d 537, 546 (Mo. banc 2012), *superseded on other grounds by* § 573.037 (evaluating a double jeopardy challenge involving a claimed continuous course of conduct).

Baum further claims that none of the conduct alleged to support the offense of promoting a sexual performance occurred in Missouri; thus, the evidence establishes Missouri's jurisdiction is insufficient. We disagree.

"This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which such person is legally accountable if . . . [c]onduct constituting any element of the offense or a result of such conduct occurs within this state." § 541.191.1(1). The elements of promoting a sexual offense, as charged, required the State to establish that Baum (1) directed (2) a performance (3) including sexual conduct (4) by a child less than eighteen years of age.

There is no dispute that Victim was a child less than eighteen years of age while she lived with Baum in Missouri. When Victim lived with Baum in Missouri (from October of 2018 to roughly May of 2020), she was 16-17 years of age. And the evidence established that she engaged in sexual conduct in the form of personal masturbation and reporting back to Baum about that masturbation while living with Baum in Missouri. Though the evidence indisputably showed that Baum purchased the vibrator, provided it to Victim, and gave *initial* instructions while they were in Florida, Victim also testified that, after providing instructions with the expectation of follow-through in Florida, Baum's same conduct both continued and escalated after they moved to Missouri. Accordingly, there was sufficient evidence that not just one but all elements occurred in Missouri.

Therefore, we would deny Point III.[15]

**Conclusion**

Because we believe the evidence was sufficient to support both the verdict directors and Baum's convictions of trafficking of a child in the second degree and promoting a sexual performance by a child, we would affirm the judgment below. But, because this case presents issues of general interest and importance, rather than entering a final decision, we transfer this case to the Missouri Supreme Court pursuant to Rule 83.02.

_____
Karen King Mitchell, Judge

Edward R. Ardini, Jr., Judge, concurs.
Alok Ahuja, Presiding Judge, dissents in separate opinion.

---

[15] In Point IV, Baum argues that the court plainly erred in submitting Instruction 8, the verdict director for Count II (promoting a sexual performance) because the evidence was insufficient to support a finding that the offense occurred in Missouri on or between January 1, 2019, and October 18, 2019. Because this point raises the same issues as Point III, we will not separately address it. In light of our resolution of Point III, we would likewise deny Point IV.

21



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD85148 |
| | ) | |
| JEREMY BAUM, | ) | Filed: May 14, 2024 |
| | ) | |
| Appellant. | ) | |

## DISSENTING OPINION

A jury convicted Jeremy Baum of one count of second-degree statutory rape and five counts of second-degree statutory sodomy. Those convictions were based on Baum engaging in sexual intercourse, oral sex, and hand-to-genital contact with the minor Victim. Baum's convictions of those six class D felonies are amply supported by the evidence at trial, and Baum does not challenge them on appeal.

This appeal involves only Baum's *additional* convictions of one count of second-degree sexual trafficking of a child, and one count of promoting a sexual performance by a child. The simple fact is, Baum did not engage in child sex trafficking, and he did not direct the Victim to perform sexual acts before an audience. His convictions of the additional sex trafficking and promoting-a-performance offenses must accordingly be reversed.

The majority affirms Baum's conviction of sexual trafficking based on different conduct than the jury relied on to convict him. In addition, the majority affirms Baum's convictions of sexual trafficking and of promoting a sexual performance without evidence establishing an essential element of each offense: that Baum forced the Victim to engage in an "exhibition" of sexual conduct "performed before an audience." §§ 566.200(15) and § 573.010(13).[1]

It is a denial of due process to affirm Baum's convictions for sexual trafficking and promoting a sexual performance based on a different theory than the one submitted to the jury, and where the evidence is plainly insufficient to prove the crimes. For these reasons, I respectfully dissent. Because of the importance of the issues presented, I join in the majority's decision to order that the case be transferred to the Missouri Supreme Court for final disposition.

## Discussion
## I.

The majority opinion rejects Baum's challenge to the sufficiency of the evidence supporting his sex trafficking conviction on the basis that "the evidence and reasonable inferences therefrom, support the conclusion that *Baum enticed Victim to masturbate in front of him while he watched.*" Op. at 13 (emphasis added). As explained below in § II.B., there is literally _no_ evidence in the record that "Baum enticed Victim to masturbate in front of him while he watched." But even if such evidence existed, this was not the act on which the jury relied to convict Baum of sexual trafficking. Jury Instruction Number 6, submitted by the

---

[1] Because the relevant offenses are alleged to have occurred between January 1, 2019 and May 14, 2020, statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2018 Cumulative Supplement.

2

State, was clear: in order to convict Baum of the sexual trafficking offense, the jury was required to find that he "enticed [the Victim] to engage in a sexual performance; *by masturbating each other in the same room . . . .*" (Emphasis added.)

Whether Baum watched the Victim masturbate herself is a different factual question, involving a different act, than the question the jury answered: whether Baum and the Victim "masturbat[ed] each other in the same room." The majority apparently believes that, in an appeal of a criminal conviction in which the defendant challenges the sufficiency of the evidence, this Court can itself sift through the trial evidence, and rely on *different acts* to sustain a conviction than the acts on which the jury relied. To the contrary, Baum's conviction for sexual trafficking can be affirmed based <u>only</u> on the specific acts the jury was required to find in order to return a guilty verdict. Baum was constitutionally entitled to have <u>a jury</u> determine whether he had committed acts constituting a criminal offense. Because only a jury, not this Court, is entitled to find the facts, we can affirm his convictions based only on the conduct on which the jury actually relied. This appeal is not a retrial; Baum's convictions must stand or fall on the findings the jury made, and the verdict it returned.

The majority opinion ignores our recent decision in *State v. Marks*, 670 S.W.3d 135 (Mo. App. W.D. 2023), which held that, in assessing the sufficiency of the evidence on appeal, "*we look to the verdict directing instruction* and determine whether sufficient evidence supports the jury's verdict as instructed." *Id.* at 141 (emphasis added).

Basic principles of criminal procedure require that we gauge the sufficiency of the evidence based on the elements the jury was required to find to return a guilty verdict.  Unlike in many other countries, in the United States a criminal defendant is entitled to have _a jury_ determine each of the facts necessary to convict the defendant of a criminal offense.

> It has been settled throughout our history that the Constitution protects every criminal defendant "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  It is equally clear that the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged."

_United States v. Booker_, 543 U.S. 220, 230 (2005) (citations omitted).  Both the United States and Missouri Constitutions require that the jury find the essential facts _unanimously_ in felony cases.  _Ramos v. Louisiana_, 140 S. Ct. 1390, 1397 (2020); _State v. Celis-Garcia_, 344 S.W.3d 150, 155 (Mo. 2011).

In addressing claims of evidentiary sufficiency, the critical issue is whether there was a sufficient evidentiary basis to support the factual determinations made by the jury in returning a guilty verdict.  The Supreme Court of the United States adopted the constitutional standard of evidentiary sufficiency to ensure that the fact-finder, whether judge or jury, had properly discharged its responsibility to convict the defendant only on proof beyond a reasonable doubt.

> The [standard of proof beyond a reasonable doubt] requires more than simply a trial ritual.  A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence.  . . .  Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could

4

find guilt beyond a reasonable doubt . . . . [W]hen such a conviction occurs in a state trial, it cannot constitutionally stand.

     . . . .

     . . . [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. . . . The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*Jackson v. Virginia*, 443 U.S. 307, 316-19 (1979) (citations and footnotes omitted).

The evidentiary-sufficiency standard adopted in *Jackson v. Virginia*, which we apply today, is meant to assure that "*the factfinder* [has] rationally appl[ied] th[e] [beyond-a reasonable-doubt] standard to the facts in evidence." *Id.* at 317 (emphasis added; footnote omitted). Thus, we must determine whether the evidence was sufficient to support the facts actually found by the jury, <u>not</u> whether the evidence may be sufficient to support some <u>other</u> facts, which a hypothetical jury *could have* found. In *Jackson v. Virginia* the Supreme Court explicitly stated that "the standard announced today does not permit a court to make its own subjective determination of guilt or innocence." *Id.* at 319 n.13.

Because a defendant has a constitutional right to have a jury unanimously determine that the evidence establishes the necessary facts beyond a reasonable

5

doubt, the Supreme Court of the United States has repeatedly emphasized that a criminal conviction can only be affirmed based on the theory on which the case was submitted to the jury.

> [I]n a criminal case a defendant is constitutionally entitled to have the issue of criminal liability determined by a jury in the first instance. . . . This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

*McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991).

In *Ciminelli v. United States*, 598 U.S. 306 (2023), the Supreme Court recently refused to apply exactly the approach taken by the majority in this case: disregarding the basis on which the jury actually returned a guilty verdict, and instead constructing an entirely separate basis for conviction from the appellate court's own assessment of the evidence. In *Ciminelli*, the Court held that a conviction for wire fraud could not be based on actions which allegedly deprived a victim of intangible property rights. *Id*. at 309 (citation omitted). The Court instead held that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." *Id*.

The jury in *Ciminelli* was instructed only on an intangible rights theory. The Government nevertheless contended that the Court could affirm the defendant's conviction based on a deprivation of "traditional property interests," even though the jury was not instructed on that theory. The Supreme Court disagreed:

> [T]he Government insists that [rejection of the "intangible property rights" theory] does not require reversal because we can affirm

6

> Ciminelli's convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory. With profuse citations to the records below, the Government asks us to cherry-pick facts presented to a jury charged on the [intangible rights] theory and apply them to the elements of a *different* wire fraud theory in the first instance. In other words, the Government asks us to assume not only the function of a court of first view, but also of a jury. That is not our role.

*Id*. at 316-17 (citations omitted).

In *Presnell v. Georgia*, 439 U.S. 14 (1978), the Supreme Court once again refused to affirm a jury verdict (there, imposing the death penalty), based on a theory different from that which had been submitted to the jury. In *Presnell*, the jury had been instructed that it could impose the death penalty if a murder had been committed in the course of the defendant's commission of aggravated sodomy. *Id*. at 14-15. The Georgia Supreme Court held that the aggravated sodomy offense could not justify capital punishment. The Georgia Supreme Court nevertheless upheld the imposition of the death penalty. "It did so on the theory that, despite the lack of a jury finding of forcible rape, evidence in the record supported the conclusion that petitioner was guilty of that offense, which in turn established the . . . [necessary] aggravating circumstance to justify the death sentence." *Id*. at 15-16.

The Supreme Court of the United States held that an appellate court could not sustain the death sentence based on an aggravating circumstance different from the one actually found by the jury. It explained:

> In *Cole v. Arkansas*, 333 U.S. 196 (1948), petitioners were convicted at trial of one offense but their convictions were affirmed by the Supreme Court of Arkansas on the basis of evidence in the record indicating that they had committed another offense on which

7

the jury had not been instructed. In reversing the convictions, Mr. Justice Black wrote for a unanimous Court:

> "It is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made. . . . "To conform to due process of law, petitioners were entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court." Id., at 201-202.
>
> These fundamental principles of procedural fairness apply with no less force at the penalty phase of a trial in a capital case than they do in the guilt-determining phase of any criminal trial.

*Presnell*, 439 U.S. at 16 (cleaned up).

Under "[t]hese fundamental principles of procedural fairness," we must assess the sufficiency of the evidence in this case based on the acts on which the jury actually relied to convict Baum; we cannot affirm his convictions based on some *other* acts which we independently determine were proven by the evidence. The Missouri Supreme Court has repeatedly admonished that, in conducting a sufficiency-of-the-evidence review, an appellate court "does not sit as a super juror." *State v. Stewart*, 560 S.W.3d 531, 533 (Mo. 2018). "Unless waived, the right to trial by jury means that the jury – *and only the jury* – will decide what the evidence does and does not prove beyond a reasonable doubt." *State v. Jackson*, 433 S.W.3d 390, 402 (Mo. 2014) (emphasis added). We should abide by these instructions, and not substitute our own findings of fact for those made by the jury.

The majority claims that Baum "*repeated[ly]* acknowledge[d]" that the verdict-directing instruction was irrelevant to his sufficiency-of-the-evidence claim. Op. at 12 n.8. On the contrary, Baum argued that his conviction of sexual

8

trafficking could be affirmed only on the basis of the mutual masturbation submitted in the verdict director. His brief explained:

> [I]n *Dunn v. United States*, 442 U.S. 100, 106 (1979), the United States Supreme Court stated:
>
>> To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.
>
> *See also Chiarella v. United States*, 445 U.S. 222, 236 (1980) (criminal conviction cannot be affirmed on the basis of a theory not presented to the jury); *Cole v. Arkansas*, 333 U.S. 196, 202 (1948).
>
> Additionally, . . . in *State v. Edwards*, 365 S.W.3d 240, 247-49 (Mo. App. W.D. 2012), the defendant was charged and convicted with statutory sodomy in general but without specifying a particular act, just that he engaged in deviate sexual intercourse with a child. In analyzing a challenge to the sufficiency, this Court noted that "per the jury's verdict director, the jury was limited to determining whether [the defendant] engaged in deviate sexual intercourse in the form of penile to anal contact with [the child]." *Id.* at 251.

Baum's brief presented a detailed and cogent argument explaining that the act submitted in the jury instruction – "masturbating each other in the same room" – must be the basis for assessing the sufficiency of the evidence to support his conviction of sexual trafficking.

Baum's sufficiency claim does not simply require us to determine whether each of the facts hypothesized in the verdict director was proven by sufficient evidence. We must <u>also</u> decide whether those facts are legally sufficient to establish the elements of the offense of which Baum was convicted. In gauging the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of

9

fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319 (citation omitted). Thus, the sufficiency-of-the-evidence inquiry involves two fundamental steps, one legal and one factual: (1) determining what the essential elements of the offense are, and how those elements must be construed (a legal question); and (2) assessing whether the trial evidence is sufficient to permit a jury to find that the legal elements have been proven beyond a reasonable doubt (a factual question).

As one court explained: "'To assess the sufficiency of the evidence, we [1] first determine the elements of the offense and [2] then examine whether the evidence suffices to establish each element.'" *Simpson v. Carpenter*, 912 F.3d 542, 591 (10th Cir. 2018) (citation omitted). Another formulation likewise recognizes the dual legal and factual components of the sufficiency analysis: "Our role is 'limited to [1] ensuring that a valid legal theory supports the conviction and [2] that there is some evidence from which a rational jury could find in favor of that legal theory.'" *United States v. Johnson*, 916 F.3d 579, 589 (7th Cir. 2019) (citation omitted); *see also, e.g.*, *United States v. Henderson*, 2 F.4th 593, 598–99 (6th Cir. 2021) (observing that "when . . . a [sufficiency-of-the-evidence] challenge focuses on whether the statute under which the defendant was convicted covers the relevant conduct, it presents a legal question that we examine anew"); *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021) (considering, as a sufficiency-of-the-evidence claim, "'the "legal" question whether the conduct the jury could reasonably have found to have occurred amounts to a conspiracy under the statute'" (citation omitted)).

The majority's blithe disregard of the verdict director essentially leaves a criminal defendant without _any_ remedy where the defendant was convicted under a verdict director which was legally or factually insufficient to establish the charged offense. The majority holds that it is irrelevant to Baum's sufficiency-of-the-evidence claim that the sexual trafficking verdict director charged him with enticing the Victim to engage in a sexual performance "by masturbating each other in the same room." The majority then goes further, and holds that Baum cannot raise this issue as a claim of *instructional error*, either. According to the majority, because Baum challenges "the *giving*, rather than the *form*, of the instruction," Op. at 14, he cannot challenge the manner in which the sexual trafficking offense was submitted to the jury in _any_ fashion – either as a sufficiency-of-the-evidence claim, or as a claim of instructional error. Apparently, a claim that a circuit court instructed the jury on an offense which is unsupported by the evidence is entirely immune from appellate review.

If not reviewed as a sufficiency-of-the-evidence claim, at a minimum Baum is entitled to review of the verdict director as a claim of instructional error. "A verdict-directing instruction must contain each element of the offense charged and must require the jury to find every fact necessary to constitute essential elements of [the] offense charged." *State v. Stover*, 388 S.W.3d 138, 153-54 (Mo. 2012) (cleaned up). As explained below, the verdict director in this case did not require the jury to find facts sufficient to constitute the offense of sexual trafficking of a child. Even viewed through the lens of plain error review, the circuit court committed evident, obvious and clear error by submitting an instruction for sexual trafficking to the jury. *See, e.g., State v. Self*, 155 S.W.3d

11

756, 762-63 (Mo. 2005) ("'If the evidence is insufficient to sustain a conviction, plain error affecting substantial rights is involved from which manifest injustice must have resulted.'" (citation omitted)); *State v. Whalen*, 49 S.W.3d 181, 184 (Mo. 2001) (same). Moreover, because the evidence is insufficient to support Baum's sexual trafficking conviction on <u>*any*</u> theory, a retrial would be barred even if this issue was viewed as a question of instructional error. *State v. Miller*, 372 S.W.3d 455, 471 n.8 (Mo. 2012). Indeed, because the evidence cannot justify Baum's sexual trafficking conviction on <u>*any*</u> basis, it is arguably unnecessary to decide whether this case is more appropriately decided based on the sufficiency-of-the-evidence argument in Point I, or the instructional-error claim in Point V, since both require reversal.

## II.

The evidence was insufficient to support either Baum's conviction for sexual trafficking, or for promoting a sexual performance by a child, because there was no evidence that Baum made the Victim engage in an "exhibition" of sexual conduct "performed before an audience."

### A.

Before considering the evidence presented at Baum's trial, it is necessary to construe the statutes defining the sexual trafficking and promoting a sexual performance offenses.

As relevant here, "[a] person commits the offense of sexual trafficking of a child in the second degree if he or she knowingly . . . entices . . . a person under

the age of eighteen to participate in . . . a sexual performance . . . ." § 566.211.1(1). A "sexual performance" is "any play, motion picture, still picture, film, videotape, video recording, dance, or exhibition which includes sexual conduct or nudity, performed before an audience of one or more, whether in person or online or through other forms of telecommunication[.]" § 566.200(15).

"A person commits the offense of promoting a sexual performance by a child if . . . the person promotes a performance which includes sexual conduct by a child less than eighteen years of age or produces, or directs any performance which includes sexual conduct by a child less than eighteen years of age." § 573.205.1. For purposes of the promoting-a-sexual-performance offense, a "performance" includes "any play, motion picture film, videotape, dance or exhibition performed before an audience of one or more[.]" § 573.010(13).

Although the definitions of a "sexual performance" in §§ 566.200(15) and 573.010(13) vary somewhat, each definition includes three key terms, which are themselves undefined: a sexual performance requires an "exhibition" performed "before" "an audience."

"'In the absence of statutory definitions, the plain and ordinary meaning of a term may be derived from a dictionary, and by considering the context of the entire statute in which it appears.'" *State v. Hurst*, 663 S.W.3d 470, 474 (Mo. 2023) (citation omitted); *see also*, *e.g.*, *State v. Shaw*, 592 S.W.3d 354, 359 (Mo. 2019).

An "exhibition" is defined as "an act or instance of exhibiting,"[2] or as "a public show or showing." WEBSTER'S THIRD NEW INT'L DICTIONARY 796 (unabridged ed. 2002). The verb "exhibit" is defined in the relevant sense as

> ***to present to view***: SHOW, DISPLAY : as
>
> a : to show . . . or display . . . outwardly *esp.* by visible signs or actions
>
> . . . .
>
> d : to show publicly : put on display in order to attract notice to what is interesting or instructive or for purposes of competition or demonstration

*Id.*; *see also* https://www.merriam-webster.com/dictionary/exhibit.

The dictionary definitions of an "exhibition" requires that an item be "present[ed] to view," or "public[ly] show[n]." Interpreting "exhibition" to require a visual display is also justified by examining the other examples of a "performance" listed in the relevant statutes. In § 566.200(15), an "exhibition" is listed as a type of "performance" alongside a "play, motion picture, still picture, film, videotape, video recording, [or] dance"; in § 573.010(13), the other forms of "performance" are a "play, motion picture film, videotape, [or] dance." *Each* of the listed methods of presentation, in both definitions, involves a *visibly observable* phenomenon. Notably, although each definition includes a "videotape" (and one additionally includes a "video recording"), neither includes an *audio* recording. Moreover, neither statute suggests that a *verbal account* of a sexual act could constitute a "performance."

---

[2] *See* https://www.merriam-webster.com/dictionary/exhibition.

14

"Under the principle known as *noscitur a sociis*, this Court will 'look[ ] to the other words listed in a statutory provision to help it discern which of multiple possible meanings the legislature intended.'" *Alberici Constructors, Inc. v. Dir. of Revenue*, 452 S.W.3d 632, 638 (Mo. 2015) (quoting *Union Elec. Co. v. Dir. of Revenue*, 425 S.W.3d 118, 122 (Mo. 2014)); *see also* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195 (2012) ("When several [words] are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar."). The surrounding terms must inform our reading of "exhibition." Consistent with the dictionary definition of "exhibition," the surrounding terms confirm that the victim must have presented her sexual performance to view, or shown it publicly.

Even if the term "exhibition" was subject to multiple meanings, some of which comprehend non-visual displays, caselaw requires that we adopt the narrowest reasonable construction of the term. "'Under the rule of lenity, an ambiguity in a penal statute will be construed against the government or party seeking to exact statutory penalties and in favor of persons on whom such penalties are sought to be imposed.'" *State v. McCord*, 621 S.W.3d 496, 498-99 (Mo. 2021) (quoting *State v. Graham*, 204 S.W.3d 655, 656 (Mo. 2006)); *see also*, *e.g.*, *State v. Knox*, 604 S.W.3d 316, 320 (Mo. 2020) ("The rule of lenity requires that criminal statutes be strictly construed against the State."; citing *State v. Salazar*, 236 S.W.3d 644, 646 (Mo. 2007)).

The correctness of interpreting "exhibition" to require a visual display is reinforced by the statutes' requirement that the "exhibition" occur "before" an

"audience." The primary relevant meanings of the preposition "[b]efore" are "in the presence of," "face to face with," "forward of, "in front of," and "in the presence of." WEBSTER'S THIRD NEW INT'L DICTIONARY at 197; https://www.merriam-webster.com/dictionary/before. And "audience" is defined as "a group of listeners or spectators," or "a reading, viewing, or listening public." https://www.merriam-webster.com/dictionary/audience; *see also* WEBSTER'S THIRD NEW INT'L DICTIONARY at 142. These definitions confirm that a "sexual performance" requires a display of sexual conduct in front of a group of spectators.

In interpreting the term "sexual performance" to include non-visual displays, the majority relies on *State v. Blankenship*, 415 S.W.3d 116 (Mo. 2013). But *Blankenship* was decided at a time when "'performance' [was] not defined statutorily." *Id*. at 121. The same is true of *State v. Ragland*, 494 S.W.3d 613, 629 (Mo. App. E.D. 2016) (interpreting § 556.061(31), RSMo Cum. Supp. 2013, which defined a "sexual performance as "any performance, or part thereof, which includes sexual conduct by a child who is less than seventeen years of age," but without further defining a "performance"); *State v. Butler*, 88 S.W.3d 126, 129 (Mo. App. S.D. 2002) (involving same definition from § 556.061(31), RSMo 2000); and *State v. George*, 717 S.W.2d 857, 858-59 (Mo. App. S.D. 1986) (involving similar definition found in § 556.061(27), RSMo Supp. 1984).

*Blankenship* and the other cases cited by the majority turned to the dictionary, and to prior judicial constructions, to give meaning to the term "sexual performance." But as *Blankenship* itself stated, resort to dictionaries and caselaw definitions is only appropriate "'*[w]hen the Legislature has not defined a*

16

*word.*'" 415 S.W.3d at 121 (emphasis added; citation omitted). *See also*, *e.g.*, *IBM Corp. v. Dir. of Revenue*, 491 S.W.3d 535, 539 (Mo. 2016) ("'The plain meaning of words, as found in the dictionary, will be used *unless the legislature provides a different definition.*'"; emphasis added; quoting *Lincoln Industrial, Inc. v. Dir. of Revenue*, 51 S.W.3d 462, 465 (Mo. 2001)). The Supreme Court has also told us that, "'[w]hen the legislature provides a statutory definition, it 'supersedes the commonly accepted dictionary or judicial definition and is binding on the courts.'" *Cosby v. Treasurer of State*, 579 S.W.3d 202, 207 (Mo. 2019) (emphasis added; quoting *State ex rel. Jackson v. Dolan*, 398 S.W.3d 472, 479 (Mo. 2013)); *Crescent Plumbing Supply Co. v. Dir. of Revenue*, 565 S.W.3d 665, 669 (Mo. 2018) ("'The legislature's own construction of its language by means of definition of the terms employed . . . supersedes the commonly accepted dictionary or judicial definition and is binding on the courts.'"; citation omitted).

The majority's glib assertion that nothing has changed since *Blankenship* cannot be reconciled with the caselaw holding that the *statutory definition* of "performance" governs here – not earlier judicial glosses placed on a then-undefined term. The majority's disregard of the statutory text, in favor of now-outmoded caselaw, is highlighted by its failure to even quote the entirety of the statutory definitions of "sexual performance" – even though those statutory definitions, and our construction of those statutory definitions, are the lynchpin of this case.

Of course, the majority's confidence that nothing has changed since *Blankenship* also runs counter to the well-established principles that "[a] court must presume that the legislature acted with a full awareness and complete

knowledge of the present state of the law," and that "when the legislature amends a statute, we presume the legislature intended to change the existing law." *Smith v. St. Louis Cnty. Police*, 659 S.W.3d 895, 898 (Mo. 2023) (cleaned up).  Here, we must presume the General Assembly was aware of *Blankenship*'s definition of a "sexual performance," and that it intended to reject or modify the judicial construction by adopting a statutory definition limited to visual displays.  We cannot uncritically rely on cases involving an undefined term to interpret statutes which now explicitly define "sexual performance."

For purposes of the offenses of which Baum was convicted, a "sexual performance" requires a visual display in front of spectators.

**B.**

With regard to Baum's conviction for sexual trafficking, there is no evidence in the record that the Victim exhibited herself to Baum, or that Baum observed anything, visually or otherwise, while he and the Victim were masturbating each other.  Thus, there is no testimony that Baum's eyes were open, that he was looking at the Victim's hand on his penis or looking at her genitals as he stimulated them, that he was watching her face or body to see how she responded to his stimulation of her genitals, etc.  In these circumstances, there was insufficient evidence to establish that Baum was an "audience" "before" whom the Victim "exhibit[ed]" herself while engaging in mutual masturbation.

Even if the evidence showed that Baum observed the Victim while committing the acts of statutory rape and statutory sodomy of which he was convicted, that would not be enough to support his separate conviction for sexual trafficking.  Any incidental observation in which Baum engaged, while

participating in sexual acts with the Victim, cannot render those acts "sexual performances." Presumably, during every sexual act, the perpetrator senses the victim, and the victim's participation in a sexual act, in some fashion, whether that be by sight, sound, touch, taste, or smell. I cannot conceive of a sexual act involving a minor victim in which the defendant is not aware of the minor's presence, and participation, in some fashion. The defendant's sensory perception of the victim, during a sexual act in which the defendant is himself participating, is not enough to make the act a "performance." _If_ the defendant's sensory perception of the victim were enough, _every_ sexual offense in which a defendant forced a minor victim to participate would also constitute sexual trafficking.

We should be hesitant to torture the language of the definition of "sexual performance" to make the offense of sexual trafficking an "add-on" which the State could choose to charge in _every_ sex-offense case. Second-degree sexual trafficking is an unclassified felony, punishable by a term of imprisonment of "not less than ten years or life and a fine not to exceed two hundred fifty thousand dollars." § 566.211.3. By contrast, Baum's underlying offenses of statutory rape, and second-degree statutory sodomy, are class D felonies punishable by imprisonment for no more than seven years, § 558.011.1(4), or a fine not to exceed $10,000. § 558.002.1(1). _Something_ beyond simple participation in a sexual act with a minor must be necessary to establish sexual trafficking.

While the statutes of every State are different, courts in other jurisdictions have faced similar questions, and held that an adult's participation in a sexual act with a minor victim, standing alone, is not sufficient to turn the sexual act into a

19

"sexual performance."  Thus, in *State v. Clay*, 457 P.3d 330 (Or. App. 2019), the Court explained:

> Having considered the text, context, and legislative history of ORS 163.670, we conclude that the legislature did not intend ORS 163.670 to capture a person's observation of his own sexual abuse of a child or observation of a child's sexual or intimate parts while sexually abusing or preparing to sexually abuse the child.  In effect, the "observation" that occurs in such a situation is incidental to the crime of sexual abuse and was not intended by the legislature to constitute the separate – and much more serious – crime of using a child in a display of sexually explicit conduct.  Rather, we understand the crime of display to capture what is colloquially called child pornography, including live sex displays.  That includes an audience of one – *i.e.*, a person making a visual recording of a child participating or engaging in sexually explicit conduct that he himself has caused to occur, or staging a live sex display involving a child for his own observation – but it does not include observation of one's own acts of sexual abuse against a child or observation of a child's sexual or intimate parts incidental to one's own acts of sexual abuse against a child.

*Id*. at 336 (footnote omitted); *see also Oquendo v. State*, 24 So.3d 746 (Fla. App. 2009) (reversing conviction for promoting sexual performance by a minor where the defendant instructed a minor to go into a bedroom with another man to have sex for money; concluding that "there was no 'performance' . . . shown by the evidence" where "[t]he door was shut, and no one else was in the room" other than the two participants); *Allen v. Commonwealth*, 997 S.W.2d 483, 487 (Ky. App. 1999) ("We do not believe that [a statute criminalizing the use of a minor in a sexual performance] is intended to apply to instances where one actively participates in sexual conduct with the minor."); *People v. Davis*, 631 N.E.2d 392, 405 (Ill. App. 1994) (no sexual performance where "all those present were participants to some extent").

The majority does not attempt to justify Baum's conviction of sexual trafficking by contending that a "sexual performance" occurred while Baum and the Victim were "masturbating each other in the same room" (the act hypothesized in the verdict director). In a single conclusory sentence in a footnote, the majority asserts that, even if it gauged the sufficiency of the evidence based on the verdict director, "there is no question that, in this case, there was sufficient evidence to prove that Baum and Victim masturbated each other in the same room as alleged in the verdict-director." Op. at 12 n.8. I agree that the evidence supports a finding that Baum coerced the Victim into engaging in mutual masturbation with him – for which he was convicted of two counts of second-degree statutory sodomy. What the majority ignores, however, is that the verdict director did not *only* require the jury to find that mutual masturbation had occurred; it *also* required the jury to find that, by engaging in that mutual masturbation, Baum "enticed [the Victim] to engage in a sexual performance." The majority simply ignores this additional, required finding. Further, the majority also ignores the fact that a sufficiency-of-the-evidence challenge does not merely require an appellate court to determine whether the evidence was sufficient for a jury to have found every fact hypothesized in the verdict director; the reviewing court must *also* determine whether the facts found by the jury meet the elements of a statutorily-defined offense.

Rather than contending that Baum's sexual trafficking conviction can be sustained on the theory the State chose to submit to the jury, the majority instead concludes that the evidence was sufficient to find that "Baum enticed Victim to masturbate in front of him while he watched." As explained in § I above, that is

21

*not* the act the jury was required to find to convict Baum of sexual trafficking, and we cannot make our own factual findings that Baum watched the Victim masturbate in order to affirm his conviction. But even if we were entitled to rely on the theory that Baum watched the Victim masturbate herself, there is no evidence in the record that ever happened. Through methodical questioning by the prosecutor, the Victim explicitly – and exhaustively – identified the sexual acts in which she and Baum engaged. Those acts did <u>not</u> include performing acts of masturbation upon herself in Baum's presence.

The Victim testified that, when she moved with Baum to Missouri, the sexual behavior "escalated." Tr. 336:25. She explained:

> It went from naps and holding kisses longer to I was spending nights in his bedroom and he had me perform mutual masturbation and oral sex and eventually penetrative sex with him.

Tr. 337:1-5. The Victim testified quite specifically what "mutual masturbation" meant: "I mean I am touching his genitalia and he is touching mine or he is using the vibrator on me." Tr. 337:6-8.

After testifying regarding the acts of mutual masturbation, the Victim testified that she and Baum also engaged in mutual acts of oral sex.

> Q.    You had just talked about when his hand was on your genitals and your hand was on his genitals. *Is there ever a time that something else was done?*
>
> A.    Yes.
>
> Q.    What was that?
>
> A.    I performed oral sex on him and he did to me.

Tr. 339:8-15 (emphasis added).

The prosecution then asked the Victim, again, whether there were other sexual acts in which she engaged with Baum. She responded:

> Q.   . . . When you were 16 years old, *did the defendant ever try anything with you other than what we have talked about so far*?
>
> A.   We once – he once tried penetrative sex with me.

Tr. 350:22-24 (emphasis added).

This is the sum total of the sexual acts which Victim described: mutual masturbation; reciprocal performance of oral sex; and at least one attempt at sexual intercourse. (Each of those acts resulted in a separate conviction of statutory rape or statutory sodomy.) Notably, on cross-examination, the Victim agreed that, when questioned by police, she was asked "if you ever used the vibrator on yourself in front of [Baum] and you shook your head no." Tr. 365:12-15. She also acknowledged that, during a forensic interview, she told the interviewer that Baum "had never used the vibrator on you or watched you use it." Tr. 367:13-16. There is nothing in the Victim's testimony to support a jury finding that Baum watched her use the vibrator, or otherwise masturbate, on herself.

I recognize that, after describing what "mutual masturbation" meant, the Victim was asked whether Baum was "giving [her] any instructions on how to do that," to which she replied that he would be "[t]elling me where to please myself, my position, things like that." Tr. 337:12-16. This statement merely relates to what Baum *said*; that single statement cannot overcome the Victim's quite specific testimony as to the *sexual acts* Baum made her perform with him. Moreover, this single statement must be viewed in context, as a response to a

question asking whether Baum ever gave her "any instructions on how to do _that_" – _i.e._, mutual masturbation. In context, the Victim's response refers only to instructions on how the Victim should position herself, and enhance her pleasure, as she and Baum manipulated each other's genitals. Even if the Victim's response is construed as an instruction concerning self-masturbation, there is no evidence the Victim actually did so in Baum's presence. While I may agree that the evidence would be sufficient to support a sex trafficking conviction if Baum had "enticed Victim to masturbate in front of him while he watched," that simply isn't this case.

## C.

The evidence is also insufficient to support Baum's conviction for promoting a sexual performance by a child. The verdict director for this charge asked the jury to find that the relevant "performance" consisted of the Victim "engaging in personal masturbation after being instructed by the defendant on how to use a sexual device." (Presumably, the instruction refers to "personal masturbation" to distinguish from the act of "masturbating each other" which was the basis for the sex trafficking instruction.)

The Victim testified that, when she was 15 and still living with Baum in Florida, he bought her a vibrator and told her how to use it:

> Q. Was there a time in your life that he bought you anything for masturbation?
>
> A. He bought me a vibrator.

Tr. 333:9-11.

24

Q.      When he bought you the vibrator, did he show you how to use it?

A.      Yeah. He showed me the charger, how it charged and then there was a settings button on the back.

Q.      Did you ever have any conversations with him or did he tell you how to use it to please yourself better?

A.      We did talk about certain areas that it would feel good, yes.

Q.      And just for the record, okay, you pointed down here and pointed like in your vaginal area?

A.      Yes.

Q.      . . . Did he ever show you ways to use it that would work better?

A.      It was more tell, he didn't show.

Q.      And then were you expected after he instructed you how to do that to go do it?

A.      Yes.

Q.      And did you?

A.      Yes, privately.

Tr. 334:16-335:14. The Victim testified generally that this behavior continued when she moved with Baum to Missouri. Tr. 336:20-22.

Baum's acts of buying the Victim a vibrator, instructing her on how to use it, followed by her acts of masturbating "*privately*," did not constitute a "sexual performance." As discussed above in § II.A, to constitute a "sexual performance," the minor must engage in an "exhibition" of sexual conduct "before an audience." There is no basis in the evidence to conclude that the Victim masturbated in front of anyone.

The Victim testified that, starting when she was 15, she and Baum "would have conversations about my masturbation and I was expected to keep him in the loop." Tr. 332:10-12. These conversations were not frequent, however, and apparently did not occur more than every other week:

> A. It was sporadic. Sometimes it would be he wouldn't talk to me for months and then would bring it up, sometimes it would be every other week.

Tr. 332:20-25. Notably, the Victim never testified that Baum asked her to describe her acts of masturbation to him, or that she did so.

Keeping Baum "in the loop," by discussing her masturbation with him "sporadic[ally]," does not convert the Victim's acts of masturbation into a "performance." Frankly, *even if* the Victim had described her acts of masturbation to Baum in detail – of which there is no evidence – this would not render her masturbation a "performance." A theater company's closed rehearsal does not become an "exhibition . . . before an audience" simply because a cast member later describes the rehearsal to a third party – even if the third party had requested a report beforehand. As explained above in § II.A, the definition of a "sexual performance," requiring an "exhibition . . . before an audience," must be read to require a visual display in front of spectators. This case does not meet that standard.

As explained in § II.A, cases like *State v. Blankenship*, 415 S.W.3d 116 (Mo. 2013), are not relevant here, because they did not involve the statutory definition of "sexual performance" which now applies. But those cases are distinguishable in any event, because with one exception, those cases involve real-time communication, even if not visual observation. Thus, in *Blankenship* there were

26

at least two incidents, on July 7 and 8, 2010, in which Blankenship and his "victim" (actually an adult undercover police officer) exchanged e-mail messages in real-time, as Blankenship directed the "victim's" progressively more erotic actions, and the "victim" confirmed that she had performed them. *Id.* at 118-19. The fact that the conviction in *Blankenship* was based on the real-time e-mail exchanges between Blankenship and his "victim" on July 7-8, 2010, is confirmed by the detailed written Verdict in this bench-tried case, which found:

> The State's evidence showed that each time "K.D." responded to defendant that she had performed the act she was dared to perform, defendant dared her to perform another sexual act and if she did it, to "explain your answer and perform the dare as though I am watching you." The acts K.D. was dared to perform escalated in terms of their sexual nature as each successive email was sent by defendant.
>
> . . . Defendant in this case was an audience of one by reason of reading the emails purportedly sent by K.D. to him in response to his own to her. He admitted to S.D., K.D.'s mother, that he sent the emails and read the responses believing he was sending them to, and receiving them from, K.D. because they gave him "sexual release." As stated in Butler, "under the circumstances here, Defendant [attempted to exploit K.D.] in a way little different from any exploitation suffered in a visual sexual presentation." Butler at 130.

*State v. Blankenship*, SC93084, Legal File at 22-23 (filed March 26, 2013) (record citations omitted). Similarly, in *State v. Butler*, 88 S.W.3d 126 (Mo. App. S.D. 2002), the defendant directed the victim to engage in sexual acts during a telephone call.

Because they both involved real-time communications while the sexual acts were ongoing, neither *Blankenship* nor *Butler* supports the affirmance of Baum's conviction for promoting a sexual performance in this case.

27

The *one* case which is arguably inconsistent is *State v. Ragland*, 494 S.W.3d 613 (Mo. App. E.D. 2016).  In *Ragland*, the defendant "showed [a minor victim] how to perform oral sex and ordered [two minor victims] to 'suck each other's penises.'"  *Id.* at 629.  Defendant contended on appeal that his convictions could not be affirmed "because there was no evidence that he *watched* [the two minor victims] engage in the sexual conduct."  *Id.*  In *Ragland*, the Court was focused on whether *visual observation* was necessary.  The Court relied on *Butler*'s statement that the relevant statutes at the time "'do[ ] not limit the definition of a "sexual performance" to a visual performance,'" *id.* (quoting *Butler*, 88 S.W.3d at 129), and *Blankenship*'s statement that "'[r]estricting the application of [the relevant statute] to visual performances only would frustrate the purpose of the statute.'" *Id.* (quoting *Blankenship*, 415 S.W.3d at 122).  Thus, *Ragland* merely rejects the argument that a "performance" must be *visually observed*.  *Ragland* cannot be read to decide an issue that was never presented, under a statutory definition which did not then exist:  namely, whether an after-the-fact verbal report to a defendant is sufficient to render a sexual act a "performance."  There is no evidence of such an after-the-fact report in this case; but even if there was, it could not sustain Baum's conviction.

## Conclusion

Because the evidence was insufficient to support Baum's convictions of second-degree sexual trafficking, and promoting a sexual performance by a child, I respectfully dissent from the majority's affirmance of those convictions.

28

Because of the importance of the issues this case presents, I agree with the majority's decision to transfer this case to the Missouri Supreme Court, and I appreciate my colleagues' willingness to do so despite our differences on the merits.

_____
Alok Ahuja, Judge